**UNITED STATES of America, Plaintiff–Appellee,**

v.

**James M. CASTNER, Defendant–Appellant.**

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Kenneth D. SECHLER, Jr., Defendant–Appellant.**

**Nos. 93–5641, 93–5642.**

United States Court of Appeals, Fourth Circuit.

Argued Dec. 9, 1994.

Decided April 5, 1995.

---

1269

**ARGUED:** David Wayne Bouchard, Bouchard & Smith, Chesapeake, VA, for appellant Castner; Charles Russell Burke, Virginia Beach, VA, for appellant Sechler. Scott Wahlgren MacKay, Senior Trial Atty., Cr. Div., U.S. Dept. of Justice, Washington, DC, for appellee. **ON BRIEF:** Helen F. Fahey, U.S. Atty. and James A. Metcalfe, Asst. U.S. Atty., Norfolk, VA, for appellee.

Before HALL, WILKINSON, and WILLIAMS, Circuit Judges.

Affirmed by published opinion. Judge WILLIAMS wrote the opinion, in which Judge HALL and Judge WILKINSON concur.

## OPINION

WILLIAMS, Circuit Judge:

James M. Castner and Kenneth D. Sechler appeal their convictions and their resulting sentences for committing major fraud against the United States, 18 U.S.C.A. §§ 1031–1032 (West Supp.1994), and mail fraud, 18 U.S.C.A. §§ 1341–1342 (West 1984 & Supp. 1994). They argue that the district court erred because: (1) it departed from its impartial role and acted as an advocate for the government during trial, (2) it incorrectly determined the amount of loss under U.S.S.G.[1] § 2F1.1 during sentencing, (3) it failed to rely on specific findings of fact to support its determination of each Appellant's ability to pay the fines and restitution imposed, (4) it incorrectly enhanced Castner's sentence for obstructing justice, and (5) it refused to reduce either Appellant's sentence for acceptance of responsibility. Finding these allegations do not warrant reversal, we affirm.

### I.

This case involves procurement fraud against the United States Navy between 1989 and 1991. A jury found that during this time, Appellants and their companies, Systems Engineering International, Inc. (SEI), and Gale Resources, Inc. (GRI), made unallowable and illegal profits from sales of materials to the Navy.

In 1986, SEI entered into a prime contract with the Department of the Navy to repair, refurbish, and maintain, among other things, computer tape drive systems installed on board various Navy ships. The contract required SEI to use only parts and equipment which met the specifications of Miltope Corporation, the original equipment manufacturer (OEM). SEI could obtain OEM-approved parts only from Miltope, from the Navy Supply System, or from companies authorized by Miltope. By late 1988, SEI experienced significant delays in obtaining OEM-approved replacement parts. Thus, in January 1989, Castner and Sechler incorporated GRI, an affiliate of SEI,[2] to obtain reverse-engineered Miltope parts from sources not approved by the OEM. GRI either obtained or assembled the reverse-engineered parts and sold them to SEI at a price substantially above GRI's cost but which was below the Miltope or OEM-approved supplier price. SEI then used these GRI parts to repair and refurbish the tape drive systems under its contract with the Navy. For these materials, SEI charged the Navy an amount equal to the price SEI paid GRI, plus a nine percent inventory support charge which it based on the Federal Acquisition Regulations (FAR),[3] plus five percent for material handling costs as allowed under the contract.

A government audit determined that between 1989 and 1991 SEI impermissibly overcharged the Navy for materials under the contract by using the "price method" rather than the "cost method" to establish its material costs under the FAR, 48 C.F.R. § 31.205–26(d) and (e). Castner and Sechler, their companies SEI and GRI, and an employee, Kyle E. Scobey, were indicted and, after a four-week jury trial, convicted of major fraud against the United States and mail fraud for making illegal profits from sales of materials to the Navy. On August 3, 1993, the district court sentenced Castner to 27 months imprisonment, a $6000 fine, a $1300 special assessment, and restitution of $50,000 to the United States. The court sentenced Sechler to 21 months imprisonment, a $5000 fine, a $1300 special assessment, and restitution of $37,500 to the United States. Castner and Sechler timely appeal their convictions as well as their sentences.

1. United States Sentencing Commission, *Guidelines Manual* (Nov.1992).

2. Castner and Sechler were part owners and directors of SEI and GRI, and each Appellant held positions as officers in each company between 1989 and 1991.

3. 48 C.F.R. § 31.205–26(e) (1993).

## II.

Appellants first argue that the district court deprived them of a fair trial, departing from its required impartial role by improperly questioning the relevance of defense exhibits, limiting witness testimony, and extensively interrupting the examination of defense witnesses to impose its own questions.

■ We disagree. Sechler objected to the district court's examination of witnesses and limiting of testimony, and moved for a mistrial, which the district court denied. Accordingly, we review Sechler's allegation that the district court's behavior deprived him of a fair trial for abuse of discretion. *United States v. Seeright,* 978 F.2d 842, 847 (4th Cir.1992). Castner, on the other hand, did not object at trial to the district court's involvement in the trial proceedings or move for a mistrial, and thus normally we would review his allegation for plain error. *See United States v. Gastiaburo,* 16 F.3d 582, 589 (4th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 102, 130 L.Ed.2d 50 (1994). Because we find no abuse of discretion, however, we need not address Castner's contentions under the plain error standard.

■ The district court has the duty to conduct a jury trial "in a general atmosphere of impartiality." *United States v. Cassiagnol,* 420 F.2d 868, 878 (4th Cir.), *cert. denied,* 397 U.S. 1044, 90 S.Ct. 1364, 25 L.Ed.2d 654 (1970). Furthermore, the court "must not create 'an appearance of partiality by continued intervention on the side of one of the parties or undermine[ ] the effective functioning of counsel through repeated interruption of the examination of witnesses.'" *United States v. Norris,* 873 F.2d 1519, 1526 (D.C.Cir.) (quoting *United States v. Liddy,* 509 F.2d 428, 438–39 (D.C.Cir.1974) (en banc), *cert. denied,* 420 U.S. 911, 95 S.Ct. 833, 42 L.Ed.2d 842 (1975)), *cert. denied,* 493 U.S. 835, 110 S.Ct. 113, 107 L.Ed.2d 75 (1989). The court, however, must "exercise reasonable control over" the interrogation of witnesses and the presentation of evidence in order to ensure the effective determination of the truth, to avoid needless waste of time in the presentation of a case, and to circumvent undue witness intimidation and embarrassment. Fed.R.Evid. 611(a). Additionally, a district court may directly interrogate witnesses under Fed.R.Evid. 614(b). Particularly in a complex case involving numerous witnesses, the district court has a crucial duty to ensure " 'that the facts are properly developed and that their bearing upon the question at issue are clearly understood by the jury.' " *Seeright,* 978 F.2d at 847 (quoting *Simon v. United States,* 123 F.2d 80, 83 (4th Cir.), *cert. denied,* 314 U.S. 694, 62 S.Ct. 412, 86 L.Ed. 555 (1941)).

■ Appellants contend, for instance, that the district court assumed an appearance of partiality by objecting to evidence that Castner sought to introduce of GRI's expense reports for 1990. The record reveals, however, that the district court did not object to Castner's proposed evidence, but rather ensured that the documents offered were relevant before admitting them into evidence:

MR. BOUCHARD [Castner's attorney]: Your honor, we move these [1990 expense reports for GRI] into evidence.

THE COURT: What is their relevance? Just as a matter of curiosity. Has it got something to do with this case?

\* \* \* \* \* \*

MR. BOUCHARD: The relevance is that the government has put into issue the compensation received by Mr. Castner. They made no determination or distinction between the various accounting[s] and are treating it all as money received by Mr. Castner. So I am breaking this out, that he has a legitimate business reason.

(J.A. 520–21.) We find no error in such comments, as the court was fulfilling its duty to ensure that the proffered exhibits were relevant before admitting them into evidence, as required by Fed.R.Evid. 402.

■ Appellants next argue the district court erred by extensively questioning Castner in a manner that they contend showed bias in favor of the government. Examination of the record, as revealed in part below, indicates that the district court was attempting to maintain control over the presentation of evidence in order to help present a clearer set of facts to the jury, as required by Rules 611(a) and 614(b) of the Federal Rules of

Evidence. For example, during Castner's testimony explaining how SEI arrived at the costs it charged the Navy for certain tape drive parts and assemblies in 1990, the following exchange occurred:

THE COURT: Excuse me. This is what that you are talking about?

THE WITNESS: This is the air bearing, Your Honor....

THE COURT: So [it] costs $192.64 per air bearing that you ordered[?]

THE WITNESS: Total cost. $42.77 in raw costs, approximately at the same as the government's.

THE COURT: It cost you $150 to process that part through your company; is that what you are telling me?

THE WITNESS: If you distribute the overhead fairly or equally to all products, yes, sir, and that's how we have always done it in the other organization. If you start dividing up—

THE COURT: So that the air bearing you think would cost you $192.64 and [SEI] could buy it for $42[?]

THE WITNESS: No. [SEI] didn't pay $42. They paid $70 for it.

THE COURT: Oh, [$]70. I thought they could buy it from Nicholson Precision machinery for $42[?]

THE WITNESS: No, sir. They couldn't buy it from Nicholson Precision.

\* \* \* \* \* \*

THE COURT: How much could SEI have purchased it for[?]

THE WITNESS: SEI purchased it from [GRI] for $55 in one case and [$]65—

THE COURT: How much could they have purchased it from Miltope for if they purchased the original?

THE WITNESS: I am guessing, Your Honor, if they purchased it from, those figures will follow, but if you want me to guess now I believe the price, Miltope price for this product was $65 and some change, and the [GRI] part price for this product was $55 and some change. So [GRI]'s was slightly less.

Do you want me to go through another one for an example?

THE COURT: Just keep right on going. (J.A. 596–98.)

Appellants similarly argue that the district court took on an unacceptably prejudicial role by extensively questioning Sechler. In particular, they argue the court erred by "interrogating" Sechler at the close of his testimony some time after he had moved for a mistrial on the grounds that the district court had "more of a prosecutorial attitude than a referee or judge or clarification approach to the case." (J.A. 823.) However, examination of the district court's questioning of Sechler indicates that the questions were all meant to clarify issues that had been placed before the jury, such as Sechler's payment of a loan to SEI, the formation of GRI, and the role of various employees and officers of SEI and GRI.

We find that the district court neither abused its discretion, nor committed plain error. The presentation of this case involved four weeks of trial during which dozens of witnesses testified and hundreds of exhibits were admitted into evidence. The evidence was highly complex, involving the intricacies of accounting principles, business management, and government contracting. The district court interrupted and interrogated both defense and government witnesses and properly questioned the relevance of certain evidence prior to admission. In so doing, we find that the district court was simply fulfilling its obligation to clarify confused factual issues or misunderstandings, to correct inadequacies of examination or cross-examination, and to " 'otherwise insure that the trial proceed[ed] efficiently and fairly.' " *United States v. Morrow*, 925 F.2d 779, 781 (4th Cir.1991) (quoting *United States v. Cole*, 491 F.2d 1276, 1278 (4th Cir.1974)); *Cassiagnol*, 420 F.2d at 879. The record indicates that the remarks of the district court did not exhibit "such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky v. United States*, —— U.S. ——, ——, 114 S.Ct. 1147, 1157, 127 L.Ed.2d 474 (1994) (recusal motion based on alleged bias of district court judge). Rather, the district court's intervention clarified the testimony and focused the jury's attention on the critical issues in a highly complicated case.

*Seeright,* 978 F.2d at 847. "A judge's ordinary efforts at courtroom administration— even a stern and short-tempered judge's ordinary efforts at courtroom administration— remain immune" and do not establish bias or partiality. *Liteky,* —— U.S. at ——, 114 S.Ct. at 1157. Therefore, we find Appellants were not deprived of a fair trial.

### III.

 Appellants next argue that the district court erred during sentencing in determining the amount of loss under U.S.S.G. § 2F1.1(b)(1), which allows incremental sentence enhancement based on the amount of loss caused by the fraud. We review *de novo* the district court's legal interpretation of the term "loss" under the Sentencing Guidelines, but "to the extent that the determination of the amount of loss is a factual matter, we review only for clear error." *United States v. West,* 2 F.3d 66, 71 (4th Cir.1993) (citing *United States v. Daughtrey,* 874 F.2d 213, 217 (4th Cir.1989)).

The debate on appeal is over what should be included in the measure of loss under § 2F1.1(b). Appellants contend that the amount of loss should have been limited to $51,557, which represented the nine percent inventory support fee illegally charged by SEI.[4] There is no dispute that $51,557 is a correct measure of loss under the Guidelines. The district court, however, determined loss based on SEI's material profit from the sale of GRI parts to the Navy because this profit was a cost savings that SEI was obligated to pass on to the Navy under the contract. The parties stipulated at sentencing that SEI's material profit was between $200,000 and $350,000, which represented the profit SEI derived by charging the Navy the price SEI paid GRI for the parts, instead of charging the Navy for GRI's cost to produce the reverse-engineered parts. Appellants reserved the right to challenge the district court's

determination that the loss to the Navy included SEI's material profit.

 Appellants make two arguments challenging the district court's determination that SEI's material profit was a proper measure of loss under U.S.S.G. § 2F1.1(b)(1). First, they argue that the FAR authorized SEI to charge the Navy for price, rather than cost, of materials supplied under the contract, and therefore that the profits were not illegal and could not be a measure of loss. Second, they argue that the profit was not a correct measure of loss because, even if SEI were not authorized to make a material profit from its sale of GRI parts, the Navy suffered no loss because it got what it bargained for under the contract: serviceable parts. We disagree, and hold that the district court did not abuse its discretion when it included SEI's material profits as a measure of loss under the Sentencing Guidelines. We address Appellants' arguments in turn.

### A.

The district court correctly determined that SEI's contract with the Navy was a "cost plus" contract, and not a "fixed price" contract, and thus that the Navy was entitled to the cost savings represented by the profits made by GRI in selling reverse-engineered parts to SEI at inflated prices, rather than at GRI's cost of producing the reverse-engineered parts. The district court specifically found that GRI was a subterfuge created to allow SEI to charge the Navy more money by hiding from the Navy the profit its affiliate GRI made on sales of materials to SEI. SEI's contract with the Navy required it to sell parts to the Navy at cost plus a five percent materials handling fee. Because GRI was an affiliate of SEI, SEI could include GRI's profits in the costs it charged to the Navy only if it demonstrated an established practice of intercompany transfers at price rather than cost for commercial work, and the price was either established by cata-

---

4. Appellants conceded during sentencing that the nine percent charge was incorrectly based on the FAR, and was not permissible under the applicable material costs provision, 48 C.F.R. § 31.205–26(e). The record alternatively refers to this nine percent fee as a material support fee, an inventory support charge or fee, and a materials han-

dling fee. It is clear from the record and briefs, however, that these references all relate to the same illegally added nine percent materials handling fee that SEI charged the Navy due to SEI's erroneous misunderstanding of the FAR regulations, 48 C.F.R. § 31.205–26(d).

logues or market sales of substantial quantities to the public, or resulted from acceptable price competition as provided in § 32.205–26(e) of the FAR.[5] *See United States v. Newport News Shipbuilding and Dry Dock Co.,* 862 F.2d 464, 470 (4th Cir.1988) ("The profit realized from a contractor's purchase of materials from a division[, affiliate,] or subsidiary cannot ordinarily be included in the allowable costs charged the government.") (citing 48 C.F.R. § 31.205–26(e)).

The record reveals that SEI did not meet the threshold requirement, pursuant to § 31.205–26(e), necessary to charge the Navy for the price, rather than cost, of materials.[6] Castner testified that GRI did no commercial work at all during 1989. Nothing in the record indicates that SEI ever sold GRI parts to anyone other than the Navy. Thus, because there was insufficient evidence of "commercial work of the contractor [SEI] or any division, subsidiary, or affiliate [GRI] of the contractor," GRI could not have had an established practice of pricing "interorganizational transfers at other than cost for commercial work." 48 C.F.R. § 31.205–26(e). We find that the district court, in order to determine loss for sentencing purposes, correctly found that SEI was not authorized to charge the Navy for the price it paid GRI for materials, and instead should have charged the Navy for the cost of obtaining those materials (plus the five percent material handling cost permitted under the contract).

**B.**

We next look more specifically at whether the district court correctly determined that the material profit SEI obtained through its fraudulent use of GRI to inflate its costs properly represented the amount of loss. Appellants contend the Navy suffered no loss, and actually benefitted from the GRI parts, because SEI provided GRI parts to the Navy at a lower cost and at an earlier date than it could have provided OEM-approved parts. Therefore, because the Navy saved time and money on the GRI parts, Appellants contend the loss from their fraudulent conduct should not include the profit SEI made on sale of the parts. Although Appellants maintain that the Navy received materials of the same quality as were bargained for in the contract, the fact remains that Appellants were aware, before they created GRI, that the contract called for OEM-approved parts. GRI did not supply OEM-approved parts. Without the Navy's approval, SEI had no authority to substitute unapproved parts from GRI, thus, its argument concerning lower costs and faster supply time is irrelevant. The district court correct-

---

5. The applicable FAR regulation, FAR § 31.205–26(e), provides:

> (e) Allowance for all materials, supplies, and services that are sold or transferred between any divisions, subsidiaries, or affiliates of the contractor under a common control shall be on the basis of cost incurred in accordance with this subpart. However, allowance may be at a price when it is the established practice of the transferring organization to price interorganizational transfers at other than cost for commercial work of the contractor or any division, subsidiary, or affiliate of the contractor under a common control, and when the price—
> > (1) Is or is based on an *established catalog or market price of commercial items sold in substantial quantities to the general public* in accordance with 15.804; or
> > (2) Is the result of *adequate price competition* in accordance with 15.804 and is the price at which an award was made to the affiliated organization after obtaining quotations on an equal basis from such organization and one or more outside sources that produce the item or its equivalent in significant quantity.

> > (3) Provided, that in either subparagraph (1) or (2) above—
> > > (i) The price is not in excess of the transferor's current sales price to its most favored customer (including any division, subsidiary or affiliate of the contractor under a common control) for a like quantity under comparable conditions; and
> > > (ii) The contracting officer has not determined the price to be unreasonable.
> 48 C.F.R. § 31.205–26(e) (emphasis in original).

6. In September 1990, over a year after SEI began selling GRI parts to the Navy on a price basis, SEI wrote to the contracting officer and requested a written determination "pursuant to FAR 31.205–26(e)(ii) ... that the price vs. cost method be allowed." (J.A. 1209.) No such written determination was ever provided. SEI's attorney, upon learning that SEI billed the Navy for GRI materials at a price greater than cost, had informed Castner and SEI in April 1990 "that the Government might prosecute SEI for fraud if [it] determined that this method violated the governing [FAR] regulations." (J.A. 1229.)

ly determined that the Navy did not receive what it bargained for under its contract with SEI.[7]

"Loss" under the Sentencing Guidelines is "the value of the money, property, or services unlawfully taken." U.S.S.G. § 2F1.1, comment. (n.7); *United States v. Bailey*, 975 F.2d 1028, 1030–31 (4th Cir.1992). In determining the value of money or property unlawfully taken, we bear in mind that "in fraudulent ... contract procurement cases, the loss is [equal to] the actual loss to the victim (or if the loss has not yet come about, the expected loss)." U.S.S.G. § 2F1.1, comment. (n.7(b)). Payment fraudulently obtained in excess of the amount to which a defendant is legally entitled is "a 'taking' of property" under the Guidelines, and thus is a proper measure of the amount of loss for sentencing purposes. *United States v. Lara*, 956 F.2d 994, 998 (10th Cir.1992). We agree with the reasoning of the Tenth Circuit in *Lara*, a case with similar facts to our own.

The defendant in *Lara*, a subcontractor on a government construction project, inflated the subtier bid quotes from his subcontractors without authorization, and thereby falsely "obtained payment in excess of what he would have received if [the managing contractor] had known the true amount of the subtier bids submitted by the subcontractors." *Id.* The defendant challenged the district court's determination that "loss" was "the difference between the true and the altered subtier bids." *Id.* The Tenth Circuit noted that "loss" under § 2F1.1 and § 2B1.1 of the Sentencing Guidelines is not simply intended to measure the victim's "net monetary damage," but should also "gauge the severity of a particular offense." *Id.* The Tenth Circuit found that loss was equal to the excess payment obtained through fraud, even though the government may have received services with a value equal to the

price it paid for those services, because the defendant was not entitled to the excess payments that were obtained by his false statements. *Id.*

Here, SEI obtained payment for the GRI parts in excess of what it was entitled to receive under the contract and the FAR. SEI was only entitled to receive payment for the cost of producing the GRI parts plus a five percent handling fee, but it received excess payment equal to GRI's profits from selling the parts to SEI. This amount of excess payment was a proper measure of loss under the Sentencing Guidelines. *Lara*, 956 F.2d at 998.

Furthermore, the GRI parts were not the OEM-approved parts bargained for in the contract.[8] The Navy required OEM-approved parts under the contract because of trouble it had in the past with parts that did not meet OEM specifications, although the supplying companies had claimed the parts would perform as well as the OEM-approved parts. Because the Navy was unaware that the GRI parts were not OEM-approved, it did not subject those parts to the rigorous testing required to assure the quality and long-term reliability of substitute parts. Thus, although Appellants contend that none of the GRI parts have malfunctioned, the Navy did not receive what it bargained for under the contract. The district court correctly determined that the amount of money unlawfully taken—the illegal profit—is an adequate measure of actual loss under § 2F1.1. *West*, 2 F.3d at 71 (amount of money unlawfully taken indicates loss under § 2F1.1 when "the government simply did not get what it paid for").

## C.

Castner and Sechler were the corporate officers primarily responsible for SEI's

---

7. The government may, of course, contract for parts with more stringent material specifications than are standard to the trade, and is entitled to receive precisely what it requested under the contract. *Blake Constr. Co. v. United States*, 28 Fed.Cl. 672, 688–89 (1993) (government may even contract for snowmen in August).

8. Thus, this case is distinguishable from *United States v. Chatterji*, 46 F.3d 1336 (4th Cir. 1995),

where the defendant's conduct resulted in no actual loss because the products—commercial therapeutic drugs that received FDA approval due to defendant's regulatory fraud—"were exactly what they purported to be." *Chatterji*, 46 F.3d at 1341. In finding no actual loss, we emphasized that the case did not involve product substitution where the product sold was not what it was claimed to be. *Id.*

fraud. The district court correctly determined that SEI could not recover material profits by charging the Navy for the price, rather than the cost, of the GRI parts because under the terms of the contract SEI was obligated to pass on the cost savings that the profits represented. The district court also properly found that the material profits were a correct measure of loss because the Navy did not receive the benefit of what it bargained for under the contract (OEM-approved parts). Therefore, we find no clear error in the district court's conclusion that the amount of loss was the stipulated value of between $200,000 and $350,000, and affirm the calculation of Appellants' sentences based upon that conclusion.

## IV.

Appellants argue the district court erred when it failed to rely on specific findings of fact as required by this Circuit concerning each Appellant's ability to pay a fine, 18 U.S.C.A. § 3572(a) (West Supp.1994), and restitution, 18 U.S.C.A. § 3664(a) (West Supp.1994). *United States v. Piche,* 981 F.2d 706, 718 (4th Cir.1992) (restitution), *cert. denied,* —— U.S. ——, 113 S.Ct. 2356, 124 L.Ed.2d 264 (1993); *United States v. Harvey,* 885 F.2d 181, 182 (4th Cir.1989) (fines); *United States v. Bruchey,* 810 F.2d 456, 459 (4th Cir.1987) (restitution under predecessor to § 3664). Specific findings of fact on the factors set forth in § 3572(a) and § 3664(a) are necessary "to assure effective appellate review of restitution orders" and fines imposed. *United States v. Molen,* 9 F.3d 1084, 1086 (4th Cir.1993) (restitution), *cert. denied,* —— U.S. ——, 114 S.Ct. 1649, 128 L.Ed.2d 368 (1994); *United States v. Walker,* 39 F.3d 489, 492 (4th Cir.1994) (fines).

 In determining the imposition and the amount of restitution under § 3664(a), the district court must "consider [factors such as] . . . the financial resources of the defendant [and] the financial needs and earning ability of the defendant and [his] dependents." 18 U.S.C. § 3664(a). The dis-

trict court must make explicit factual findings as to these factors, and should key these findings "to the specific type and amount of restitution ordered." *United States v. Plumley,* 993 F.2d 1140, 1143 (4th Cir.) (per curiam) (citing *Bruchey,* 810 F.2d at 459), *cert. denied,* —— U.S. ——, 114 S.Ct. 279, 126 L.Ed.2d 230 (1993).[9] In determining the imposition and amount of a fine under § 3572(a), the district court must consider, among other things, the income, financial resources, and earning capacity of the defendant, as well as "the burden that the fine will impose upon the defendant" and his dependents. 18 U.S.C. § 3572(a). A district court may satisfy these requirements if it adopts a defendant's presentence investigation report (PSR) that contains adequate factual findings to allow effective appellate review of the fine or restitution. *See United States v. Gresham,* 964 F.2d 1426, 1431 (4th Cir.1992) (affirming $80,200 fine when PSR indicated defendant's potential earning capacity was "above average"); *Molen,* 9 F.3d at 1086–87 (noting that incomplete or unclear findings in the PSR may preclude effective review of restitution).

 Because Appellants failed to object during sentencing to the calculation of fines and restitution, they have waived appellate review absent plain error. Fed.R.Crim.P. 52(b); *United States v. Grubb,* 11 F.3d 426, 440 (4th Cir.1993). According to *United States v. Olano,* —— U.S. ——, ————————, 113 S.Ct. 1770, 1777–79, 123 L.Ed.2d 508 (1993), four conditions must be met to correct plain error under Rule 52(b): there must be (1) an error, such as deviation from a legal rule; (2) the error must be plain, meaning obvious or, at a minimum, clear under current law; (3) the error must affect substantial rights—in other words, the error must be so prejudicial as to affect the outcome of the proceedings in the district court; and, finally, (4) the reviewing court must determine if the error " 'seriously affects the fairness, integrity or public reputation of judicial proceedings.' " *United States v. Hanno,* 21 F.3d 42,

---

9. The defendant, however, bears the burden of establishing by a preponderance of the evidence "his inability to make restitution." *United States v. Morrison,* 938 F.2d 168, 172 (10th Cir.1991);

*see* 18 U.S.C. § 1664(d) (defendant must prove financial resources and needs by preponderance of the evidence).

45 (4th Cir.1994) (quoting *Olano,* —— U.S. at ——, 113 S.Ct. at 1779). Appellants bear the burden of proof with respect to prejudice of their rights. *Olano,* —— U.S. at ——, 113 S.Ct. at 1778.

 The district court here adopted the factual findings of each Appellant's PSR. Appellants contend, however, that the PSRs do not contain sufficiently detailed information about the earning capacity and the financial needs and resources of each Appellant and his dependents necessary to support the amount of fines and restitution imposed. We disagree. Each Appellant's PSR describes an excellent job history, earning record, and high skill level in the computer field, thus indicating that each has a good future earning potential. Both Appellants have founded their own businesses and have a history of success at business management.

Both Appellants are well educated with some college training, served in the military, are in good health, and have no history of substance abuse. Castner had ten years experience with Sperry Univac, earning $35,000 a year as a manager of its East Coast Service System, before he founded SEI in 1981. He and his wife had adjusted gross incomes ranging from $41,208 to $89,195 between 1989 and 1991. His wife is self-employed, earning $800 a month. Prior to sentencing, Castner worked as a hotel night clerk earning $5.50 an hour, and has been offered this job after release from incarceration.

Sechler worked six years for Sperry Univac, and then was employed full time by Norden Service Company earning $1403 per week as Director of Operations before serving as officer and director of SEI and GRI. He and his wife had adjusted gross incomes ranging from $49,946 to $136,898 between 1988 and 1991. His wife earns $700 a month. Before sentencing, he and his wife were living rent-free courtesy of Sechler's mother, who also paid their monthly electricity ex-

penses and provided them additional money when needed.

 Although both Appellants filed for bankruptcy prior to sentencing and had negative net monthly cash flows at the time of sentencing, the government contends these were temporary setbacks due to the Appellants' prosecution in this case.[10] A sentencing judge may order an indigent defendant to pay restitution if the defendant's financial circumstances indicate that he "can feasibly comply with the order without undue hardship to himself or his dependents." *Bailey,* 975 F.2d at 1032. Although Appellants at the time of sentencing had a negative net monthly cash flow, this does not necessarily indicate an inability to pay, particularly when their PSRs reflect past success in business and above average earning capacities. *Gresham,* 964 F.2d at 1431; *Morrison,* 938 F.2d at 172 (restitution upheld against defendant with negative net monthly cash flow because of his business management experience and education); *United States v. McClellan,* 868 F.2d 210, 213 (7th Cir.1989) (restitution exceeding defendant's current ability to pay upheld because of defendant's earning capacity and potential future increases in income).

Appellants offered no proof that the failure of the district court to make separate independent findings of fact that each would have the earning capacity to pay the amounts imposed was error. Because Appellants' PSRs contain sufficient facts to support the imposition of their fines and restitution, we conclude that under the plain error standard, the district court did not err in calculating their fines and restitution.

## V.

 Castner challenges the district court's two-level enhancement of his sentence for obstruction of justice pursuant to U.S.S.G. § 3C1.1 because it found that he committed perjury during his trial testimony.

---

10. Castner's PSR indicated a negative net monthly cash flow of $388, and although it indicated a joint net worth with his wife of $12,283.55, the PSR also stated that Castner had filed for bankruptcy and claimed to owe a debt in excess of $212,000. Sechler's PSR indicated a negative net worth of $72,379 and a negative net monthly cash flow of $130. Sechler contested $60,000 of the debts contributing to his negative net worth as belonging to Castner because this amount arose out of SEI and GRI's failure to pay taxes while Castner was in charge of the companies.

On appeal, he argues that because he objected to a sentence enhancement that was based on his trial testimony, the district court failed to make a specific finding addressing each element of his alleged perjury as required by *United States v. Dunnigan,* —— U.S. ——, ——, 113 S.Ct. 1111, 1117, 122 L.Ed.2d 445 (1993). *Dunnigan* does not require such a specific finding, but notes that "it is preferable for a district court to address each element of the alleged perjury in a separate and clear finding." *Id.* However, as the government correctly points out, a district court's determination of enhancement for perjury is sufficient if the court's finding of obstruction "encompasses all of the factual predicates for a finding of perjury." *Id.* These predicates involve a finding that a defendant "gave false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Id.* at ——, 113 S.Ct. at 1116.

■ The district court's findings during sentencing support its determination of perjury. Testimony of several witnesses and other evidence contradicted Castner's version of facts on which he could not have been confused or mistaken. The district court specifically found Castner's testimony was blatantly false because Castner testified that the Navy was aware of GRI's existence, which was proven to be untrue, and also because Castner disregarded his attorney's advice that charging the Navy for GRI's price instead of cost could lead to criminal prosecution and testified that he thought this practice was permitted by the FAR regulations. The district court's factual determination that Castner intentionally gave false testimony on these matters was not clear error. *Daughtrey,* 874 F.2d at 217–18.

## VI.

■ Finally, both Appellants contend the district court erred when it refused to grant them a two-level reduction in offense level on their sentences under U.S.S.G. § 3E1.1 for acceptance of responsibility. We disagree, bearing in mind that the district court "is in a unique position to evaluate a defendant's acceptance of responsibility," and

its determination "is entitled to great deference on review." U.S.S.G. § 3E1.1, comment. (n.5); *United States v. White,* 875 F.2d 427, 430–31 (4th Cir.1989). The district court's decision whether to grant a reduction for acceptance of responsibility is a factual determination that we will not disturb on appeal unless it is clearly erroneous. *United States v. Greenwood,* 928 F.2d 645, 646 (4th Cir.1991). To receive a reduction under § 3E1.1, a defendant must prove by a preponderance of the evidence that he has clearly recognized and affirmatively accepted "personal responsibility for his criminal conduct." *United States v. Martinez,* 901 F.2d 374, 377 (4th Cir.1990). We address each Appellant's argument in turn.

### A.

■ Sechler contends the district court erred when it refused to grant him a reduction for acceptance of responsibility. First, he argues that the district court should have found that he accepted responsibility for his criminal conduct because it did not find that he obstructed justice by perjuring himself on the witness stand. A defendant, however, is not entitled to a reduction for acceptance of responsibility merely because he did not obstruct the administration of justice during his trial. The adjustment for acceptance of responsibility "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." § 3E1.1, comment. (n. 2). Although a defendant may exercise his right to trial and still receive an adjustment for acceptance of responsibility, such situations are rare and the determination of acceptance must "be based primarily upon pre-trial statements and conduct." *Id.*

■ During sentencing, Sechler admitted his failure to realize that the nine percent charge was not allowed under SEI's contract with the Navy, but still maintained that, although he recognized he was wrong, he did not intentionally defraud the Navy. Intent is an essential element of major fraud against the United States, and the jury must have found beyond a reasonable doubt that Sech-

ler intended to defraud in order to convict. *See* 18 U.S.C. § 1031. Thus, the district court did not err in refusing to adjust downward when Sechler, by denying his intent to defraud, did not completely accept responsibility for all of his criminal conduct. *See United States v. Strandquist,* 993 F.2d 395, 401 (4th Cir.1993) (partial admission of acts constituting crime, without admission of crime itself, is not acceptance of responsibility).

 Second, Sechler argues that the district court abused its discretion in refusing to award him an adjustment for acceptance of responsibility when it granted such a downward adjustment to his co-defendant Scobey. We disagree. The evidence supports the district court's finding that Scobey played a lesser role in the scheme to defraud the Navy. The district court sentenced both Scobey and Sechler within their applicable Sentencing Guidelines ranges. "We reject claims of disparate sentences when they are based solely on a lesser sentence imposed on a codefendant, and the defendant's sentence falls within the applicable guideline range." *United States v. Allen,* 24 F.3d 1180, 1188 (10th Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 493, 130 L.Ed.2d 404 (1994). We conclude that the disparity in Sechler's and Scobey's sentences, based in part on the district court's decision to award only Scobey a downward adjustment for acceptance of responsibility, does not indicate an abuse of discretion.

For the above reasons, we therefore find that the district court did not commit clear error in refusing to award Sechler a downward adjustment for acceptance of responsibility.

### B.

Castner also contends that the district court erred when it refused to award him a sentence reduction for acceptance of responsibility. We disagree. The district court specifically found that Castner did not accept responsibility for his criminal acts because he failed to admit that his actions were wrong. The court further found that, as to the unallowable nine percent materials support fee, both Castner and Sechler showed "no remorse whatsoever ... [for] blatantly cheat[ing] the United States Government [out] of in excess of $50,000." (J.A. 1077.) Castner still maintained at his sentencing hearing that he did not intend to defraud the Navy. As we previously indicated concerning his co-defendant Sechler, the jury must have found Castner's intent to defraud in order to convict. Castner did not admit his intent, thereby failing to accept responsibility for all of his criminal conduct. *See Strandquist,* 993 F.2d at 401. Furthermore, Castner concedes that his obstruction enhancement, which we have upheld in section V., indicates that the district court did not commit clear error when it refused to award him a reduction for acceptance of responsibility. *United States v. Melton,* 970 F.2d 1328, 1335 (4th Cir.1992). Therefore, we hold that the district court's refusal to grant Castner a downward adjustment for acceptance of responsibility was not clearly erroneous.

### VII.

Accordingly, we affirm the Appellants' convictions and sentences.

*AFFIRMED.*