**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

No. 98-4099

NATHANIEL JOHN LITTLE, a/k/a Nate,
a/k/a Red,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

No. 98-4100

WILLIAM LAMONT SLATE, a/k/a
Chicago,
Defendant-Appellant.

Appeals from the United States District Court
for the Eastern District of Virginia, at Newport News.
Rebecca B. Smith, District Judge.
(CR-97-41)

Argued: December 3, 1998

Decided: March 23, 1999

Before LUTTIG, WILLIAMS, and TRAXLER, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Charles E. Haden, Hampton, Virginia, for Appellant Little; James Spaulding Powell, Gloucester, Virginia, for Appellant Slate. Michael R. Smythers, Assistant United States Attorney, Norfolk, Virginia, for Appellee. **ON BRIEF:** Helen F. Fahey, United States Attorney, Norfolk, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Nathaniel John Little ("Little") and William Lamont Slate ("Slate") were named, along with three other individuals, in a thirty-five count indictment. After a joint trial, Little and Slate were convicted of multiple offenses and sentenced. They appeal their convictions and sentences on numerous grounds. We affirm.

I.

The record provides the following background. The charges against Little and Slate stem from a crack cocaine and marijuana distribution ring that began in January 1990. This narcotics ring operated in Virginia, in New Kent and Gloucester counties and near the town of West Point. Initially, Brian Washington ran the operation. In January 1996, however, Little, who was also known as "Red," began directing the operation which by this time was centered at the Washington Burgess Inn in New Kent County and on 15th Street in West Point. Indeed, Little labeled 15th Street -- an area where Washington and other drug pushers in Little's group plied their trade -- "Reds Block." J.A. 393. Several months later, in October or November 1996, Slate became involved in Little's ring, purchasing cocaine from Little and

2

distributing it to customers in Gloucester County. At its zenith, this enterprise produced $1000 - $2000 per night in drug sales.

Evidence at trial demonstrated that Little did not shrink from violence in connection with his drug trade. In November 1996, Little and Roderick Williams, a member of Little's group, attempted to kill a rival drug dealer and his wife but the victims survived the attack. Later that month, Little served as the triggerman in a drive-by shooting of drug competitors who were making sales in Little's territory on 15th Street in West Point.

Cleveland "Petey" Christian was involved in Little's narcotics ring, selling drugs for Little and also receiving cocaine from him for personal consumption. On January 4, 1997, Petey accompanied Little to the Washington Burgess Inn. Little was apparently under the impression, created by Slate, that Petey was a "snitch" and might potentially inform the authorities about Little's activities. Little summoned Slate to the motel, ostensibly to have Slate and Petey clarify whether, in fact, Petey posed any such threat. After Slate arrived at Little's motel room, however, Little shot Petey in the head with a .45 caliber semi-automatic handgun. Little's girlfriend, Angela Edwards, was in the room and witnessed Little murdering Petey. Little also told various people that he killed Petey. Slate, who brought plastic with him to the motel, wrapped up the body and dumped it at a nearby river landing with the help of his wife.

Shortly after the murder, Little was arrested. While in custody, he told law enforcement officers that he was not at the Washington Burgess Inn on the night of the murder. At trial, however, Little decided to testify and reversed himself, admitting that he was in the room when Petey was killed. In fact, Little did not deny that his handgun fired the bullet that killed Petey, nor did he deny that he was holding the handgun immediately before and after it discharged. Rather, Little claimed that Slate was somehow able to snatch the gun, shoot Petey and throw it back into Little's hand, essentially in one fluid motion and before Little could react.

Little was indicted on the following charges: conspiracy to possess with intent to distribute crack cocaine, marijuana, and heroin, see 21 U.S.C.A. § 846 (West Supp. 1998); conducting a continuing criminal

3

enterprise, see 21 U.S.C.A. § 848(a), (c) (West Supp. 1998); murder in furtherance of a continuing criminal enterprise, see 21 U.S.C.A. § 848(e)(1)(A) (West Supp. 1998); seven counts of possession with intent to distribute crack cocaine, see 21 U.S.C.A. § 841(a)(1) (West 1981); four counts of distribution of crack cocaine or heroin, see 21 U.S.C.A. § 841(a)(1); employment and use of a person under 18 years of age to distribute cocaine base, see U.S.C.A. § 861(a)(1) (West Supp. 1998); engaging in a drive-by shooting, see 18 U.S.C.A. § 36(a)(1)-(2), (b)(1) (West Supp. 1998); and four counts of using and carrying a firearm in relation to a drug trafficking crime, see 18 U.S.C.A. § 924(c)(1).

Prior to trial, Little moved to suppress the statement he made to the police shortly after his arrest on the ground that the statement was involuntary because he was experiencing heroin withdrawal symptoms at the time. He also moved that his trial be severed from Slate's trial on multiple grounds. The district court denied these motions. Subsequently, the jury found Little guilty on each and every count of the indictment. The district court then imposed a sentence that included a life term of imprisonment.

Slate was initially charged with capital murder by the Commonwealth of Virginia. During the course of the Commonwealth's investigation, Slate gave an oral and a written statement to Lieutenant Maxwell Strigle of the Gloucester County Sheriff's Department in which he explained the events surrounding the murder and admitted that he and his wife disposed of the body after Little shot Petey. After Slate retained counsel, he gave oral and written statements to Corporal James Anthony of the New Kent County Sheriff's Department which were consistent with his previous statements that he and his wife dumped the body at the river after Little committed the murder. Eventually, the Commonwealth dropped its charge against Slate, and Slate's federal prosecution went forward.

Slate was indicted on five counts: conspiracy to possess with intent to distribute crack cocaine, marijuana, and heroin, see 21 U.S.C.A. § 846; accessory after the fact to murder, see 18 U.S.C.A. § 3 (West Supp. 1998); and three counts of possession of crack cocaine with intent to distribute, see 21 U.S.C.A. § 841(a)(1). Prior to trial, Slate also moved for a severance from Little, but the district court denied

4

this motion. Like Little, Slate was convicted on every count of the indictment and received a sentence that included a life term of imprisonment.

II. Little's Appeal

A.

Little appeals on several grounds, but he concentrates his efforts on the district court's refusal to grant a severance, which we will not disturb without a clear abuse of discretion. See United States v. Reavis, 48 F.3d 763, 767 (4th Cir. 1995). In asserting that the district court should have allowed him a separate trial, Little advances essentially the same arguments he made below, urging us to depart from the standard rule "that defendants who are charged in the same criminal conspiracy should be tried together." Id.; see Zafiro v. United States, 506 U.S. 534, 537 (1993).

First, Little claims that he was denied access to exculpatory testimony that Slate, who exercised his Fifth Amendment right not to testify, could have provided had Slate not been on trial with him. Little contends that Slate's exculpatory testimony would consist of a statement that Slate made to his wife that he, not Little, killed Petey. We reject this argument, which is generally not a winning one. See Reavis, 48 F.3d at 767 ("A defendant's attempt to have her trial severed from that of a co-defendant is far less likely to succeed when the request is based on the asserted need for a co-defendant's testimony."). In order to demonstrate that he is entitled to a severance based on the need for a co-defendant's testimony, Little must establish:

> (1) a bona fide need for the testimony of his co-defendant;
>
> (2) the likelihood that the co-defendant would testify at a second trial and waive his Fifth Amendment privilege;
>
> (3) the substance of his co-defendant's testimony; and
>
> (4) the exculpatory nature and effect of such testimony.

5

Id. (quoting United States v. Parodi, 703 F.2d 768, 779 (4th Cir. 1983)). Clearly, Little fails to satisfy, at the very least, the second and fourth elements of the Parodi test. Little does no more than speculate about whether Slate would have testified, suggesting that he could have forced Slate to testify in a separate trial by requesting that he be granted immunity. We see nothing in the record demonstrating a "reasonable probability," Parodi, 703 F.2d at 779 (internal quotation marks omitted), that Slate would have offered exculpatory testimony on Little's behalf in a separate trial. Moreover, Little has failed to show that testimony from Slate would be exculpatory in any way. Indeed, Slate told law enforcement officers that Little killed Petey; thus, Slate's testimony quite likely would have implicated Little in the murder, not exonerated him.[1] Little's alleged need for Slate's testimony, then, is not an appropriate basis to deviate from the standard rule that co-conspirators should be tried together. The district court did not abuse its discretion in refusing to do so.

Next, Little argues that he and Slate should have been tried separately because they employed mutually antagonistic defenses. The fact that co-defendants shield themselves with antagonistic or mutually exclusive defenses, however, does not automatically require a severance. See Zafiro, 506 U.S. at 538-39. Instead, "a district court should grant a severance ... only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Id. at 539. The district court here concluded that Little and Slate did not present antagonistic defenses because only Little

_____

[1] For that matter, Little has undoubtedly failed to establish the other two elements of the Parodi test. First, he has not offered any proof of the purported substance of Slate's testimony; he is merely guessing. And, we note parenthetically that the substance of the anticipated testimony took shape only on appeal. In front of the district court, Little simply made a "vague and conclusory" allegation that his co-defendants would offer exculpatory testimony, which is insufficient. Parodi, 703 F.2d at 780 (internal quotation marks omitted). Second, even if it were clear that Slate would have waived the Fifth Amendment, taken the stand and testified that he told his wife that he, not Little, killed Petey, Little really has no genuine need for this testimony since Slate's statement to this effect came in through the testimony of Officer Strigle. See J.A. 877.

6

was charged with murder. We agree with that conclusion; however, even if the defenses employed by Little and Slate could be considered mutually exclusive, Little has simply not demonstrated any prejudice from the joint trial, and we can find none in the record.

Finally, Little argues that he should have been granted a severance because the district court admitted into evidence Slate's statement to police that Little killed Petey. Because Slate chose not to testify at trial, Little argues that his rights under the confrontation clause of the Sixth Amendment were violated by the admission of this statement, see Bruton v. United States, 391 U.S. 123 (1968), and that the required remedy in this instance was a severance because Slate's statement could not be satisfactorily redacted. Little did not make this argument to the district judge; in fact, counsel for Little actually agreed to the admission of the statement which was not redacted to omit references to Little. See J.A. 869. Little, therefore, induced the district court to permit the introduction of the statement and cannot now complain that he was entitled to a severance when his complaint is based on evidence that he agreed should come in. See United States v. Herrera, 23 F.3d 74, 75 (4th Cir. 1994).

We point out further that if Little did not invite the district court to erroneously admit Slate's statement, he at least failed to object to it. When a defendant fails to make a contemporaneous objection, we review for plain error. See United States v. Olano, 507 U.S. 725, 731-32 (1993). In order to reverse for plain error, we are required to find: "1) error; 2) that is plain; and 3) that affect[s] substantial rights." United States v. David, 83 F.3d 638, 641 (4th Cir. 1996) (alteration in original) (internal quotation marks omitted). Even if these three prerequisites are fulfilled, we will exercise our discretion to notice the error only if it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." Olano, 507 U.S. at 732 (alteration in original) (internal quotation marks omitted). We conclude that the district court did not plainly err in refusing to grant a severance to Little.[2]

_____

[2] It is not precisely clear whether Little contends on appeal that the admission of Slate's statement itself entitles him to a new trial or whether he contends that it merely gave him additional grounds for a severance. To the extent Little argues, apart from the severance question, that the

7

The district court acted well within its discretion in denying Little's motion to sever the trials.[3]

## B.

Little argues that the district court erred in denying his motion to suppress the statement he made to Officers Oakley and Strigle shortly after his arrest in which he denied being at the Washington Burgess Inn on the evening of Petey's murder. Little contends that his confession was not voluntary because he was suffering the ill effects of heroin withdrawal. We must conduct an independent determination of whether, in view of "the totality of the circumstances," Little's statement was voluntary, United States v. Braxton, 112 F.3d 777, 781 (4th Cir.) (en banc) (internal quotation marks omitted), cert. denied, 118 S. Ct. 192 (1997); however, we review the district court's findings of fact on the issue for clear error, see id. After an evidentiary hearing at which Little and Officer Strigle testified, the district court found that Little exhibited no behavior that would have notified the officers that he was unable to comprehend and waive his Miranda warnings, that Little supplied appropriate responses to the officers' questions, and that Little, in fact, was not sick. We conclude that these findings were not clearly erroneous. Further, application of the totality of the circumstances test leads us to the conclusion that Little's statement was voluntary and the district court properly refused to suppress it.

## C.

Little argues that there was insufficient evidence to support a guilty

_____

introduction of the statement entitled him to a new trial under Bruton, we disagree. In light of Little's agreement that the prosecution could introduce Slate's statement regardless of Bruton, and considering the overwhelming evidence of Little's guilt, we believe that any error here would not undermine the integrity of our judicial system. See Olano, 507 U.S. at 732.

[3] We also reject as completely meritless Little's argument that he should have been granted a severance because of the risk that he would be convicted based on his association with Slate. The record contains overwhelming evidence of Little's guilt.

verdict on any of the charges against him and that the district court erred in denying his motion for acquittal. Viewing the evidence in the light most favorable to the Government, we must affirm Little's conviction if the evidence is such that "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307 319 (1979) (emphasis in original). Our review is de novo. See United States v. United Med. & Surgical Supply Co., 989 F.2d 1390, 1401 (4th Cir. 1993). Having closely considered the record, we conclude that the evidence is more than sufficient to sustain Little's convictions on each count.

D.

Little attacks his sentence on four grounds. First, he objects to the four-level enhancement applied by the district court for Little's leadership role in the narcotics enterprise. A four-level enhancement for the assumption of an "aggravating role" is appropriate "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S. Sentencing Guidelines Manual § 3B1.1(a) (1997). Little suggests that the record does not support the district court's conclusion that he was a leader or organizer of the drug ring in which he was involved. Essentially, then, his contention turns on the district court's findings of fact, which we review for clear error. See United States v. Castner, 50 F.3d 1267, 1279 (4th Cir. 1995). In light of the substantial evidence that Little assumed control of the conspiracy when he joined it, we conclude the district court's factual determinations reveal no error, let alone a clear one.

Next, Little objects to the two-level enhancement he received for victim restraint. This adjustment applies "[i]f the victim was physically restrained in the course of the offense." U.S.S.G. § 3A1.3. He bases his argument on the testimony of Angela Edwards, who was in the hotel room on the night of the murder and testified that Petey was not bound by Little. The district court, however, relied on testimony from Gerald Garner who testified that, on the evening of the murder, he saw Little order Petey into a car in West Point. When Petey refused, Little struck him on the head with a gun. After Petey still resisted, Little struck him in the head again, forcing Petey into the car. Furthermore, there was testimony that once Petey got into the car, Lit-

9

tle "put the pistol behind his head." J.A. 547. The district court concluded that, based on these facts, the restraint of victim enhancement was appropriate. We agree. The Guidelines instruct that "`[p]hysically restrained' means the forcible restraint of the victim such as by being tied, bound, or locked up." U.S.S.G. § 1B1.1, comment. (n.1(i)). However, these examples do not comprise an exclusive list of ways to physically restrain a victim within the meaning of the Guidelines. See United States v. Stokley, 881 F.2d 114, 116 (4th Cir. 1989). The concept is broader: "`Restrain' is defined as`1. To control: check. 2. To take away freedom or liberty of. 3. To restrict or limit.'" Id. (quoting Webster's Second New Riverside University Dictionary (1984)). We think it is clear that Little's use of force to control and direct Petey's movement against his will amounts to physical restraint, as does his use of the gun inside of the car. See United States v. Jones, 32 F.3d 1512, 1519 (11th Cir. 1994) (concluding that"physical restraint" occurs when "the obvious presence of handguns ensure[s] the victims' compliance"). The district court properly applied the two-level enhancement for restraining the victim.

Little also objects to his two-level enhancement for obstruction of justice, see U.S.S.G. § 3C1.1, although he fails to identify specifically the district court's mistake. The district court concluded that Little committed perjury in denying his involvement in the murder and in the drug operation despite the overwhelming evidence to the contrary. The court reviewed the evidence and made the independent factual determination that Little perjured himself at trial with respect to the murder charge and the drug enterprise, matters which were obviously material at trial. See United States v. Dunnigan , 507 U.S. 87, 95 (1993) (explaining that it is sufficient for the sentencing court to apply an obstruction enhancement if it "makes a finding of an obstruction of ... justice that encompasses all of the factual predicates for a finding of perjury"). The district court committed no error.

Finally, Little contends that his conviction for murder in furtherance of a continuing criminal enterprise was connected to most of the other counts by a common criminal objective or as part of a common scheme and, therefore, should have been grouped with those counts for purposes of sentencing. See U.S.S.G.§ 3D1.2(b). Under subsection (b), however, grouping is appropriate only if the counts to be grouped involve the same victim, which is clearly not the case here.

10

Rather, the district court considered § 3D1.2(d), the only subsection which could possibly apply. But, under subsection (d), all offenses that are covered by Chapter Two, Part A of the Guidelines are specifically excluded from grouping. Because the guideline covering murder falls under Chapter Two, Part A, see U.S.S.G. § 2A1.1, the district court correctly concluded that Little's murder conviction could not be grouped.

III. Slate's Appeal

A.

Slate, like Little, argues that the district court erroneously denied his motion to sever. On appeal, he advances the same assertion he made to the district court: the evidence of wrongdoing was so overwhelming against Little, and so slight against Slate, that he suffered a prejudicial spillover effect. As the court has recognized before, "[t]he fact that the evidence against one defendant is stronger than the evidence against other defendants does not in itself justify severance" since, were it otherwise, such motions in a conspiracy case would "have to be granted almost as a matter of course." United States v. Brooks, 957 F.2d 1138, 1145 (4th Cir. 1992). Rather, Slate "must establish that prejudice would result from a joint trial ... not merely that separate trials would result in a better chance of acquittal." Id. There was plenty of evidence to support Slate's convictions; indeed, on four of the five counts, Slate does not argue on appeal that the district court erred in refusing to grant a motion for acquittal based on the insufficiency of the evidence. We do not perceive any prejudice to Slate merely because the quantity of evidence against Little was greater than that against Slate, nor do we see any other source of prejudice requiring separate trials. Accordingly, we conclude that the district correctly denied Slate's motion for a severance.

B.

Slate asserts that he was prejudiced by the conduct at trial of both the prosecutor and counsel for Little. First, Slate argues that he was a victim of prosecutorial misconduct because the Government's attorney referred to him as the "parolee from Chicago." Slate points us to four instances over the course of the seven day trial where Slate's sta-

11

tus as a parolee was mentioned. Slate, however, did not object to the use of this term at trial, nor did he move in limine to exclude evidence of his parole status. Thus, Slate can prevail on this issue only if the district court committed plain error. See Olano , 507 U.S. at 731-32. We have reviewed the portions of the record highlighted by Slate and conclude that the district court did not plainly err. In fact, Slate's contention that the prosecutor incessantly referred to him as a "parolee" mischaracterizes the record. For example, in one portion of the record cited by Slate in support of his argument, the prosecutor simply asked Slate's wife, who was with Slate when he disposed of the body, to explain why they did not later report the murder to the police. Her response was that "well, you are on parole now, and I'm scared, and I don't know if we should or not." J.A. 1063-64. Slate's argument is meritless.

Next, Slate argues that he was entitled to a mistrial when counsel for Little called him to the witness stand in the presence of the jury, knowing full well that Slate did not intend to testify. Following Little's testimony, Little's trial counsel called Slate to the stand, which prompted Slate's counsel to request a bench conference. Outside of the jury's presence, Slate's counsel indicated that Slate intended to exercise his Fifth Amendment right not to testify and that trial counsel for Little had been told of Slate's intention to remain silent prior to calling Slate as a witness. Counsel for Slate, however, did not move for a mistrial. The district court concluded that Slate could not be called to the stand by Little since Slate intended to invoke his right under the Fifth Amendment not to testify. Moreover, the district court found that counsel for Little failed to give sufficient notice that he planned to call Slate and acted improperly in raising the issue in front of the jury. When the jury returned, the court immediately issued a standard instruction regarding Slate's right not to testify. Slate did not object to this instruction or request that the court amplify it in any way.

Slate believes that the conduct of Little's attorney amounted to an impermissible comment on Slate's right not to testify under the Fifth Amendment. Indeed, the Fifth Amendment "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." Griffin v. California, 380 U.S. 609, 615 (1965). Here, however, it was Little's attorney, not the prosecutor, who commented on Little's failure to testify. As an initial

12

observation, we are not fully convinced that Slate's"right to remain silent was ... impaired [because] the comment on his silence was made by a codefendant's counsel, not by the prosecutor." United States v. Griffith, 756 F.2d 1244, 1253 (6th Cir. 1985). Even if we were to apply the same standard that we use to examine conduct coming from the prosecutor, we reject Slate's position. The question in determining whether the prosecution improperly commented on a defendant's failure to testify is whether "the language used [was] manifestly intended to be, or was it of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." United States v. Francis, 82 F.3d 77, 78 (4th Cir. 1996). In this instance, no comment was made expressly referring to Slate's failure to take the stand, and we do not believe that a reasonable jury would necessarily conclude that Little's counsel was making a veiled suggestion that Slate's "silence[was] evidence of guilt." Griffin, 380 U.S. at 615.

Finally, even if Little's calling Slate to the stand amounted to an error under Griffin, we conclude "that it was harmless beyond a reasonable doubt." Chapman v. California, 386 U.S. 18, 24 (1967). We rest this conclusion on the compelling nature of the evidence of Slate's guilt, see United States v. Hasting, 461 U.S. 499, 510-12 (1983), and the fact that the conduct occurred on a single, isolated occasion, coupled with the court's instruction given immediately to the jury regarding Slate's constitutional right not to testify.

C.

Next, Slate asserts that his Fifth Amendment rights were violated by the admission of Slate's written account of the murder which Slate prepared for his attorney Damien Horne on a state capital murder charge arising from Petey's slaying. During the course of the Commonwealth's investigation of the murder, Slate, with Horne present, made an oral statement to Corporal Anthony, identifying Little as the killer and explaining the events that occurred on the night of the murder. Subsequently, Slate prepared a written statement for Horne that mirrored in all material respects the oral statement he gave to the police.[4]

_____

[4] Slate also made two statements, one oral and one written, for Lieutenant Strigle before Horne's involvement as Slate's attorney. These statements were consistent with the ones Slate made under Horne's observation.

13

Horne then forwarded the written statement to an attorney for the Commonwealth. The Commonwealth later dropped the capital murder charge against Slate.

At Slate's trial on his federal charges, Corporal Anthony recounted Slate's oral statement for the jury; however, when the government sought to introduce Slate's written statement, Slate objected on the basis of the attorney-client privilege, claiming that he never authorized Horne to forward his statement to the attorneys for the Commonwealth. After the statement was admitted into evidence, Horne testified outside of the presence of the jury that the written statement was provided to the authorities in order to clarify the details of Slate's prior oral statement to Corporal Anthony. Horne explained that his intention was to encourage the Commonwealth to reduce the charges against Slate and that this idea was thoroughly discussed with Slate, who agreed. Relying on this testimony, the district court determined that there had been no breach of the attorney-client privilege.

We do not perceive any error. And, even if the district court erred in admitting the written statement, the error was harmless since the contents of the written statement are virtually the same as that of his oral statement to Corporal Anthony and his statements to Officer Strigle. Furthermore, we agree with the district judge that the issue should have been anticipated prior to trial and presented to the district court by way of a pretrial motion. Because Slate did not do so, he waived his grounds for suppressing the statement. See United States v. Wilson, 115 F.3d 1185, 1190 (4th Cir. 1997). Accordingly, Slate is not entitled to relief on this basis.

D.

Finally, Slate challenges his sentence. He believes that the district court should have classified him as a minimal participant in the drug conspiracy under U.S.S.G. § 3B1.2 because the evidence showed that he was involved in a very small number of drug transactions when compared to Little and other members of Little's drug ring. At Slate's sentencing hearing, the district judge rejected this argument, finding that Slate admitted to purchasing drugs to pass along to other customers, spent time at the Washington Burgess Inn, understood "the activities and the scope of this conspiracy," J.A. 1462, and was not the least

14

culpable member of the entire organization when compared with those who were not charged. Additionally, the district court noted that Slate disposed of the body following a murder that was committed in furtherance of the drug conspiracy. In view of the record, the district court's factual determination was not clearly erroneous. See Castner, 50 F.3d at 1279.[5]

IV.

For the reasons set forth above, we affirm the convictions and sentences of Little and Slate on all counts.

AFFIRMED

_____

[5] We have carefully reviewed Slate's remaining contention that the district court erred in denying his motion for acquittal on his conspiracy charge and conclude that it is without merit.

15