**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 15-4517**

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

    v.

KAIXIANG ZHU,

        Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  T. S. Ellis, III, Senior District Judge.  (1:12-cr-00258-GBL-11)

Argued:  October 28, 2016                       Decided:  April 12, 2017

Before TRAXLER, DIAZ, and HARRIS, Circuit Judges.

Affirmed by published per curiam opinion.

**ARGUED**: Jessica Nicole Carmichael, HARRIS & CARMICHAEL, PLLC, Alexandria, Virginia, for Appellant.  Christopher John Catizone, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.  **ON BRIEF**: Dana J. Boente, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

PER CURIAM:

Kaixiang Zhu was convicted by a jury of conspiring to commit immigration fraud, *see* 18 U.S.C. § 371, and aiding and abetting fraud and misuse of immigration documents, *see* 18 U.S.C. § 1546(a), charges stemming from a green card sting operation. Zhu appeals his conviction on various grounds. For the reasons set forth below, we affirm.

I.

Zhu, a native of China, entered the United States in February 2001 using a J-1 visa authorized for nonimmigrant exchange visitors.[1] Although his J–1 visa authorized only a temporary stay until August 2001, Zhu overstayed his visa and remained in the United States without authorization. Zhu subsequently married Xiu Yun Lu, a fellow Chinese citizen he had met in the United States. In 2004, Zhu's wife unsuccessfully attempted to adjust her status to permanent legal resident, and an order of removal to China was entered against her. Likewise, Ming Hui Lu, Zhu's brother-in-law and housemate, applied to adjust his status, but his application was denied and an order of removal was entered against him.

---

[1] In the Mutual Educational and Cultural Exchange Act of 1961, Congress authorized the State Department "to provide, by grant, contract, or otherwise, for . . . educational exchanges . . . by financing visits and interchanges between the United States and other countries of students, trainees, teachers, instructors, and professors." 22 U.S.C. § 2452(a)(1). The State Department, in turn, created the Exchange Visitor Program "to provide foreign nationals with opportunities to participate in educational and cultural programs in the United States and return home to share their experiences." 22 C.F.R. § 62.1(b).

In 2011, federal agents commenced a sting operation in which Officer Mark Butler, who was operating undercover, posed as a private business owner offering to sell *bona fide* green cards which had been obtained illegally. Officer Butler, known to his contacts as "Andrew," claimed that he had a relationship with American immigration officials through whom he could obtain green cards to sell, but Andrew indicated the price would be exorbitant—at least $25,000 apiece, and sometimes even in excess of $60,000. In this scheme, Andrew did not deal directly with individuals who wanted to obtain a green card without having to go through the proper legal channels; instead, he used "brokers" both to identify potential customers in their communities and to communicate with them. The brokers were also tasked with bringing their customers to Virginia for a face-to-face meeting with Andrew, which law enforcement agents secretly recorded.

Zhu was brought into the green card scheme by Chang Yun Hui ("Dr. Hui")[2], an acquaintance from New York who was a broker for Andrew. Dr. Hui spoke very little English but, according to Officer Butler, he always had someone to translate at hand. Their primary form of communication, however, was via email. Andrew told Dr. Hui that the green cards were very expensive and explained that "they were real green cards obtained fraudulently, and that [they] could all go to jail if [they] didn't do things exactly

_____

[2] Dr. Hui was a doctor of traditional Chinese medicine; the full scope of what this entails is unclear from the record.

the right way." J.A. 310. Officer Butler testified that he "wanted to have the price so high that people knew it was illegal." J.A. 310.

In order to obtain one of the green cards offered by Andrew, would-be purchasers were required to provide certain documents to Dr. Hui, who would submit them to Andrew. Zhu gave Dr. Hui a copy of his Chinese passport, two passport photos, and a Form I-485 to adjust status, which was filled out in English and in Zhu's handwriting. Zhu's Form I-485 was incomplete and contained several misstatements, including, for example, Zhu's assertion that he was applying "with" his wife to adjust status. J.A. 477. Likewise, Lu, Zhu's brother-in-law, and Qiao Chan Zhang, Zhu's sister-in-law, sought to purchase green cards from Andrew and provided passports and Form I-485 applications to Dr. Hui. Like Zhu's Form I-485, the forms submitted by Lu and Zhang contained misstatements and omissions. Dr. Hui sent Zhu's paperwork, along with the documents provided by Lu and Zhang, to Andrew. Andrew then asked Dr. Hui to bring his customers from New York to Virginia purportedly to meet Andrew and to be fingerprinted for their green cards.

In August 2011, Dr. Hui accompanied Zhu, Lu and Zhang, and 13 other customers to the Crystal City Hilton in Virginia. Dr. Hui brought his customers in small groups to a room rented by Andrew, which, unbeknownst to Dr. Hui and his customers, was wired for audio and video recording. During each meeting, Andrew explained to the customers that "this isn't an [i]mmigration office" and that "what we are doing is not legal. We can all go to jail." J.A. 728. Andrew "provided several warnings . . . to inform them that . . .

4

this is dangerous, [and] illegal." J.A. 338. Nevertheless, Zhu permitted Andrew to fingerprint him.

For several months after the meeting, Andrew and Dr. Hui exchanged emails about the status of the green cards. In April 2012, Andrew sent an email to Dr. Hui, suggesting that he "relax" and that he was "working on all the stuff you ask for. [T]hese people need to realize that this is illegal and doesn't [work] like it would if you go into the immigration office." J.A. 191. On April 24, Dr. Hui responded, listing customers, including Zhu, that still wanted to pay Andrew for green cards:

> I got your email, please do your best to help them do what they want, I will tell them to wait for your good news. Thank you! . . . The other cards please follow this order to give them: mingxian chen, qiaochan zhang, baodi hu, yingjiao yang, meixia tian, *kaiyang zhu*, xiuqing wu, xuejiang chen, jinjian lin, jianling lin, jinshun zhu, yuewen zheng, wu lin. Please [reply]! Thank you!
>
> DR. HUI

J.A. 191 (emphasis added).

Finally, in June 2012, Dr. Hui and his customers were told that the green cards were ready and that they could pick them up in exchange for cash at a hotel in Manassas, Virginia. Zhu, however, was not among the customers who appeared in Virginia to purchase a green card, and neither were his brother-in-law Lu or his sister-in-law Zhang. The customers who appeared in Virginia were arrested.

Dr. Hui was also arrested and charged in connection with the immigration fraud conspiracy. He cooperated with law enforcement agents, submitting to a post-arrest interview about the green card scheme. Agents prepared a report summarizing the details

5

of Dr. Hui's interview which reflected his clear understanding that the means by which he and his customers were obtaining green cards was illegal. According to the report, Dr. Hui explained that "'Andrew' told him (HUI) that he could get the green cards and that he (HUI) knew the process in obtaining green cards was illegal"; and Dr. Hui "indicated 'Andrew' did not mention about the clients' green cards being obtained through fraudulent means, but that he (Hui) understood the paperwork for the green cards was not legitimate." J.A. 757. Dr. Hui also "acknowledged that he knew it was an illegal process to mail-out the documents," J.A. 759, and that he "knew that taking fingerprints was part of the process of obtaining the green card through fraud." J.A. 760.

The report, however, contained a contradictory remark attributed to Dr. Hui. The report stated that Dr. Hui specifically identified four customers, including Zhu's in-laws Lu and Zhang, whom he told that they were obtaining the green cards legally:

> HUI stated that he advised the [four] individuals that *'Andrew's' way of obtaining the green cards was legal* and that the green cards are 'real' green cards. HUI stated that he knew the legal process to obtain green cards was by applying through Citizenship and Immigration Services (CIS). . . . HUI stated that he (HUI) did not think that the green card itself was fraudulent, but knew that the process in obtaining the green card was illegal. HUI stated he needed a green card himself and that he knew 'Andrew's' way of obtaining one was not the proper way.

J.A. 758 (emphasis added). According to the report, Dr. Hui did not mention Zhu specifically during his interview with the agents. Dr. Hui pled guilty and was sentenced to fourteen months' incarceration. On June 25, 2013, following his release from prison, Dr. Hui was removed to China.

6

In 2014, Zhu and Lu were apprehended in Arkansas; Zhang remained at large at the time of Zhu's trial. Zhu was charged with conspiracy to commit immigration fraud, *see* 18 U.S.C. § 371, and aiding and abetting the fraud and misuse of immigration documents, *see* 18 U.S.C. § 1546(a). Prior to trial, Zhu moved to dismiss the indictment on the basis that, by removing Dr. Hui, "the government deported a witness material and favorable to [Zhu's] defense." J.A. 63. The district court denied Zhu's motion, concluding that Zhu had not shown that Dr. Hui's testimony "would have been material and favorable to [the] defense in ways not merely cumulative to the testimony of available witnesses." J.A. 158. Zhu also moved before and during trial to exclude from evidence an April 24, 2012, email from Dr. Hui to Andrew listing Dr. Hui's customers who were interested in purchasing a green card after the meeting with Andrew. The district court disagreed and admitted Dr. Hui's email. After a jury trial, Zhu was convicted on both counts.

On appeal, Zhu challenges the denial of these motions as well as the district court's frequent interruptions of defense counsel's examination of witnesses and argument to the jury. For the reasons set forth below, we affirm.

## II.

Zhu contends that the removal of Dr. Hui violated his right to compulsory process under the Sixth Amendment and his right to a fair trial under the Due Process Clause of the Fifth Amendment. The appropriate remedy, according to Zhu, was dismissal of the indictment. Thus, Zhu argues the district court erred in denying his motion to dismiss. We review a district court's legal conclusions with respect to a motion to dismiss the

7

indictment de novo, and its factual findings for clear error. *See United States v. Perry*, 757 F.3d 166, 171 (4th Cir. 2014).

## A.

Prior to trial, Zhu moved to dismiss the indictment on the basis that, by removing Hui, the government "deported a witness material and favorable to [Zhu's] defense." J.A. 63. Pointing to a statement in the government's report that Dr. Hui "advised [four specified] individuals that 'Andrew's' way of obtaining the green cards was legal," J.A. 758, Zhu argued that, had he appeared as a witness, Dr. Hui would have testified that he advised *all* of his customers, including Zhu, that his way of obtaining the green cards was legal. Zhu's primary defense at trial was that he lacked criminal intent—that he believed he was legally applying for a green card. Thus, Zhu contended that Dr. Hui's "testimony bears directly on the intent element" of the charges against Zhu, and that the government knew this but removed Dr. Hui anyway. J.A. 65.

The district court denied Zhu's motion, concluding that Zhu had not shown that Dr. Hui's testimony "would have been material and favorable to [the] defense in ways not merely cumulative to the testimony of available witnesses." J.A. 158. The court found "no basis in the record" to conclude that Dr. Hui would have testified "that he made [a] similar statement"—that obtaining green cards in this fashion was legal—"to all of the customers instead of just to that group of four." J.A. 162. Moreover, the district court concluded that Dr. Hui's "testimony on criminal intent would be cumulative to the testimony of other available witnesses," *id.*, in light of the fact that Zhu's brother-in-law was available to testify about what Zhu was told about the legality of obtaining the green

8

card through Dr. Hui. And, finally, the district court reasoned that even if Dr. Hui appeared and testified as Zhu claimed, his testimony, viewed "in the context of the entire record," J.A. 161, was not reasonably likely to affect the judgment of the jury.

B.

The Sixth Amendment states that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI. In *United States v. Valenzuela-Bernal,* 458 U.S. 858 (1982), the Supreme Court made clear that this right is implicated by the deportation of an alien whom a criminal defendant wants to call as a witness at trial. The Court explained what a defendant must show to establish a Sixth Amendment claim under the Compulsory Process Clause:

> [T]he right to compulsory process guaranteed by the Sixth Amendment suggests that more than the mere absence of testimony is necessary to establish a violation of the right. Indeed, the Sixth Amendment does not by its terms grant to a criminal defendant the right to secure the attendance and testimony of any and all witnesses: it guarantees him compulsory process for obtaining *witnesses in his favor*. . . . This language suggests that respondent cannot establish a violation of his constitutional right to compulsory process merely by showing that deportation of [witnesses] deprived him of their testimony. He must at least make some plausible showing of how their testimony would have been both material and favorable to his defense.

*Id.* at 867 (internal quotation marks and citations omitted).

Of course, the removal of potential witnesses "deprives the defendant of an opportunity to interview the witnesses to determine precisely what favorable evidence they possess," and thus "the defendant cannot be expected to render a detailed description of their lost testimony." *Id.* at 873. Nonetheless, the defendant must make *some* showing

9

of materiality. Accordingly, a defendant raising a compulsory process claim must make "a plausible showing that the testimony of the deported witnesses would have been material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses." *Id.*

And, given the clarity of the prejudice requirement in *Valenzuela-Bernal*, it is hardly surprising that the Circuit Courts of Appeal unanimously require this showing of prejudice that resulted from the absence of the deported witness. *See, e.g., United States v. Gonzales*, 436 F.3d 560, 578 (5th Cir. 2006) ("This first prong is universal: the defendant must show prejudice to his case.").

A majority of the Circuits read *Valenzuela-Bernal* as establishing a second requirement as well—that the government acted in bad faith in deporting a key witness, in a conscious effort to gain a tactical advantage by suppressing exculpatory evidence. *See United States v. Leal-Del Carmen*, 697 F.3d 964, 970 (9th Cir. 2012); *United States v. Damra*, 621 F.3d 474, 489-90 (6th Cir. 2010); *United States v. Chaparro-Alcantara*, 226 F.3d 616, 624 (7th Cir. 2000); *United States v. Iribe-Perez*, 129 F.3d 1167, 1173 (10th Cir. 1997).

This court has not directly addressed whether *Valenzuela-Bernal* requires a showing that the government deported a material witness in bad faith. The government urges us to adopt the bad faith requirement, premised on the Court's pronouncement in *Valenzuela-Bernal* that "immigration policy adopted by Congress justifies the prompt deportation of illegal-alien witnesses upon the Executive's good-faith determination that they possess no evidence favorable to the defendant in a criminal prosecution." 458 U.S.

10

at 872. The district court found "not a scintilla of evidence of bad faith." J.A. 160-61. Indeed, Zhu is in this particular fix because of his own decision to flee arrest and live as a fugitive in another part of the country for more than two years. We doubt the government is required to keep a removable alien in the country indefinitely on the off chance that a fugitive from justice is discovered in the distant future and needs the alien as a trial witness. We need not reach the issue of whether bad faith is an element of a compulsory process claim, however, because, as explained below, we conclude that Zhu failed to establish prejudice.

## C.

Zhu argues that Dr. Hui would have testified that he told his customers, including Zhu, that he advised them that the green card scheme was legal. Such testimony, Zhu claims, would have been both material and favorable to his defense because the testimony "bears directly on the intent element of each charge in the indictment" and "would have established that the first time [Zhu] discovered the process was illegal was in the meeting in Virginia with the undercover agents, and that at that meeting, he gave his fingerprints, but never followed-up, and never returned." Brief of Appellant at 21.

First, we note that Zhu's contention that Dr. Hui would have furnished the defense material, favorable and exculpatory testimony rests on a thin reed. It is premised on a single sentence pulled from the government's report of Dr. Hui's interview indicating that Dr. Hui specified four customers whom he told that Andrew's "way of obtaining the green cards was legal." J.A. 758. Lu was one of the four customers specified by Dr. Hui, but Zhu was not and there is nothing in the report to suggest that Dr. Hui made a similar

11

statement to every customer. Indeed, apart from that single statement, Dr. Hui repeatedly indicated during the interview that he understood Andrew's process for obtaining green cards was illegal. There is no basis in the record for concluding that Dr. Hui would have testified that he told Zhu their activities were legal. Zhu's argument is grounded in speculation, and he cannot satisfy the materiality requirement with speculative evidence. *Cf. United States v. Shealey*, 641 F.3d 627, 634 (4th Cir. 2011) (defendant must demonstrate "actual prejudice, as opposed to mere speculative prejudice" to be entitled to dismissal of indictment under Due Process Clause of Fifth Amendment).

Moreover, even if Dr. Hui had appeared and testified that he stated to Zhu that they were not illegally obtaining green cards, such testimony simply would not have been "material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses." *Valenzuela-Bernal*, 458 U.S. at 873. Evidence is material "only if there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact." *Id.* at 874. Materiality "must be evaluated in the context of the entire record." *Id.* at 868 (internal quotation marks omitted). The post-arrest report shows that Dr. Hui was well aware of the illegality of obtaining green cards on the black market. Zhu's Form I-485 contained numerous false statements regarding his employment status, how he entered the United States and the basis on which Zhu claimed he was entitled to a green card. And, it is undisputed that Zhu allowed his fingerprints to be taken even after having been warned that what he was doing was illegal and that he could do jail time for purchasing green cards.

12

Zhu cannot show that Dr. Hui's speculative testimony would not have been "merely cumulative to the testimony of available witnesses." *Id.* at 873. Zhu contends that the report of the interview demonstrates that Dr. Hui told all of his customers that obtaining a green card through him was legal. Dr. Hui is not the only witness who could offer testimony as to what he informed his customers regarding the legality of the scheme. Zhu's brother-in-law Lu was with Zhu at the August 25, 2011, meeting when Dr. Hui introduced Zhu, Lu and his other customers to Andrew. Lu would have been in a position to verify that Dr. Hui told him and Zhu that they were not breaking the law by obtaining the green cards outside of the USCIS. Zhu did not call Lu as a witness, however, nor did Zhu call any other individual who attempted to purchase a green card with Dr. Hui's assistance. Because other witnesses could have provided the same testimony that Zhu sought from Dr. Hui, Dr. Hui's testimony was cumulative and therefore not "material" within the meaning of *Valenzuela-Bernal*.

Finally, to the extent that Zhu styles this argument as a due process claim, we likewise reject it for the foregoing reasons. *Valenzuela-Bernal* made clear that "the same materiality requirement [that applies to a compulsory process claim] obtains with respect to a due process claim" under the Fifth Amendment. *Id.* at 872. To the extent a criminal defendant claims that the deportation of a witness was so fundamentally unfair that it "fatally infected the trial," his claim fails "unless there is some explanation of how [the witnesses'] testimony would have been favorable and material." *Id.*

13

## III.

Zhu next argues that the district court erred in admitting into evidence the April 24 email from Dr. Hui providing Andrew a list of customers, including Zhu, who still wanted to obtain a green card after meeting Andrew. On appeal, Zhu focuses on two grounds for excluding the email: (1) there was insufficient evidence to establish the authenticity of the email under Rule 901 of the Federal Rules of Evidence; and (2) the email contained inadmissible hearsay in violation of Rule 802. The district court denied Zhu's pre-trial motion to exclude, and Zhu renewed these objections at trial when the government moved to admit the email. We review a district court's decision to admit evidence over a Rule 802 or Rule 901 objection for abuse of discretion. *See United States v. Cornell*, 780 F.3d 616, 629 (4th Cir. 2015) (admission of evidence over Rule 901 objection was not abuse of discretion); *United States v. Bumpass*, 60 F.3d 1099, 1101-02 (4th Cir. 1995) (admission of evidence over hearsay objection reviewed for abuse of discretion).

## A.

### Rule 901

First, Zhu argues that the government could not properly authenticate Dr. Hui's email of April 24, 2012, as required by Rule 901. Under Rule 901, "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). It is up to the jury to decide "whether evidence is that which the proponent claims." *United States v. Vidacak*, 553 F.3d 344, 349 (4th Cir.

14

2009). It is "[t]he district court's role . . . to serve as gatekeeper in assessing whether the proponent has offered a satisfactory foundation from which the jury could reasonably find that the evidence is authentic." *Id.* "The burden to authenticate under Rule 901 is not high—only a *prima facie* showing is required." *Id.*

Zhu argues that "there was significant doubt as to the authenticity of the email purportedly from Dr. Hui," Brief of Appellant at 33, on April 24, 2012, in light of these facts: the email was written in English; Dr. Hui spoke little or no English and used an unknown translator to help him write his emails to Andrew; a third party, "Mr. Liu," wrote an email on May 23, 2011, using Dr. Hui's email account; and Dr. Hui's entire collection of emails were not signed the same way every time but used multiple versions of "Dr. Hui" in closing. The government produced neither Dr. Hui nor the translator to testify that Dr. Hui did in fact author the emails and that they were translated correctly. The district court disagreed, however, and found "enough evidence to meet the low threshold that must be met under Rule 901, that this came from [Dr. Hui]." J.A. 375. The district court also concluded that "even though we don't know the identity of the interpreter, . . . we don't have any reason . . . to doubt that it's a reasonable interpretation [of] what Dr. Hui was saying. He had, after all, a history and a series of transactions with the agent, and these are all . . . relating to facts that Hui and the agent knew about." J.A. 374-75.

We agree with the district court that the government offered enough evidence for the jury to conclude that the email was what the government as the proponent claimed it was: an email from Dr. Hui listing customers, including Zhu, who were still interested in

15

obtaining green cards after the hotel meeting with the undercover agents in Virginia. Officer Butler, who played the role of Andrew in the sting, testified the April 24 email was part of an email "conversation between [himself] and Dr. Hui." J.A. 350. Officer Butler explained that Dr. Hui's email was sent from a "secret e-mail address that only Dr. Hui and I knew about," J.A. 351, and contained information "only he would know," J.A. 350. This testimony is sufficient to clear the relatively low *prima facie* hurdle. The reasons identified by Zhu to doubt the authenticity of the email go to its weight, not its admissibility, and counsel for Zhu was free to highlight these deficiencies during cross examination of Officer Butler. The district court's job was not to "find that the evidence [was] necessarily what the proponent claim[ed], but only that there [was] sufficient evidence that the *jury* ultimately might do so." *Vidacak*, 553 F.3d at 349 (internal quotation marks omitted). Accordingly, the district court did not abuse its discretion in admitting the email over Zhu's Rule 901 objection.

B.

Rules 801 and 802

We next turn to Zhu's hearsay objection. Zhu contends that Dr. Hui's email contained two layers of hearsay. Zhu argues that the April 24 email contained Dr. Hui's out-of-court statements offered for the truth of the matter asserted. The district court concluded that Dr. Hui's email qualified as the statements of a co-conspirator, and therefore was not hearsay. *See* Fed. R. Evid. 801(d)(2)(E) (excluding from the definition of hearsay a statement "made by the party's coconspirator during and in furtherance of the conspiracy"). Zhu does not challenge this ruling on appeal.

16

Zhu instead focuses his challenge on what he contends was a second layer of hearsay. Because Dr. Hui did not speak English, he received help from an unknown person or persons in communicating with Andrew by email. Thus, Zhu contends that it was "unknown whether the translator acted purely as a conduit for the language" and thus "it was the translator's statement and not simply Dr. Hui's [statement] being offered by the government." Brief of Appellant at 33-34.

Our analysis of whether an interpreter's translation constituted hearsay is governed by *Vidacak*, in which we considered whether the out-of-court statements of an interpreter constituted hearsay where he was translating for a criminal defendant who was being interviewed by an immigration officer. *See* 553 F.3d at 351-52. We explained that "except in unusual circumstances, an interpreter is no more than a language conduit and therefore his translation does not create an additional level of hearsay." *Id.* at 352 (internal quotation marks omitted). Further, we recognized "a narrow exception that is applied where the particular facts of a case cast significant doubt upon the accuracy of a translated confession." *Id.* (internal quotation marks omitted). *See also United States v. Shibin*, 722 F.3d 233, 248 (4th Cir. 2013) ("[I]nterpreted testimony might be unusable without the interpreter's presence," if "the particular facts of a case cast significant doubt upon the accuracy of a translated [statement]." (internal quotation marks omitted)).

In order to determine if this "narrow" exception applies, *Vidacak* identifies four factors for district courts to consider: "1) which party supplied the interpreter; 2) whether the interpreter had a motive to mislead or distort; 3) the interpreter's qualifications and language skills; and 4) whether actions taken subsequent to the conversation were

17

consistent with the statements translated." 553 F.3d at 352 (internal quotation marks omitted).

The district court recognized that it could not fully evaluate these four factors because the identity of Dr. Hui's translator was unknown. The court therefore directly examined the underlying question which these four factors were designed to help courts answer: whether the particular circumstances of the case cast doubt on the accuracy of a translated statement. The court found that the email was part of a series of messages between Dr. Hui and the undercover agent "all relating to facts that Hui and the agent knew about." J.A. 375. Based on this, the district court appeared to hold that the interpreter acted as a mere "language conduit" and "[did] not create an additional level of hearsay," J.A. 372, even if that conclusion was not explicit in its ruling from the bench.

As *Vidacak* makes clear, it is the "unusual" case that requires an interpreter's presence to avoid a hearsay objection. 553 F.3d at 352. In this case, the district court had little basis for concluding that the interpreter used by Dr. Hui "harbored any bias against" Zhu or "had any motive to mislead or distort." *Id.* at 352. On the contrary, Agent Butler's testimony supports the district court's view that it was reasonable to believe that the April 24 email reflected what Dr. Hui intended to say. Butler testified that the messages came from a "secret email address that only Dr. Hui and [Butler] knew about," and contained information from past conversations or meetings between the two individuals. J.A. 351. Additionally, the emails frequently referenced transactions and facts known only to Dr. Hui and the agent, suggesting that the translations were reliable.

18

We hold that, on this record, the district court did not abuse its discretion in admitting the April 24 email from Dr. Hui.

IV.

Finally, Zhu contends that the district court improperly interfered with his presentation of a defense by repeatedly interrupting counsel's questions to witnesses and interfering with counsel's closing argument to the jury, essentially taking on the role of a prosecutor. We review this assertion for abuse of discretion. *See United States v. Castner*, 50 F.3d 1267, 1272 (4th Cir. 1995) (abuse of discretion standard of review applied to allegation that district court "depart[ed] from its required impartial role by improperly questioning the relevance of defense exhibits, limiting witness testimony, and extensively interrupting the examination of defense witnesses to impose its own questions").

The district court's role is "not that of an umpire or of a moderator at a town meeting," but rather "to see that a case on trial is presented in such way as to be understood by the jury, as well as by himself." *United States v. Parodi*, 703 F.2d 768, 775 (4th Cir. 1983) (internal quotation marks omitted). Thus, a district court is empowered to question witnesses, *see* Fed. R. Evid. 614(b), and, indeed, the court "should not hesitate to ask questions for the purpose of developing the facts," *Parodi*, 703 F.2d at 775.

In discharging its duty to see that the evidence is properly developed, the district court should be mindful of its responsibility "to conduct a jury trial in a general atmosphere of impartiality." *Castner*, 50 F.3d at 1272 (internal quotation marks omitted).

19

When questioning witnesses, the court must be especially careful "not [to] create an appearance of partiality by continued intervention on the side of one of the parties or undermine the effective functioning of counsel through repeated interruption of the examination of witnesses." *Id.* (internal quotation marks and alteration omitted).

A review of the record, the government points out, reveals that the district court in this case interrupted the examination of witnesses by attorneys for the government virtually the same number of times it interrupted defense counsel's examinations. Zhu does not dispute this assertion. Therefore, the district court's interruptions during the presentation of evidence, assessed from a standpoint of sheer volume, did not create an appearance of partiality on the part of the court.

Zhu argues that despite the fact that the district court's interruptions were relatively even in number, the interruptions differed in tone and effect and created the impression that the court favored the government. Toward this end, Zhu offers a few examples—presumably the most egregious instances he could find—of the court's interference with Zhu's presentation of evidence during the trial.

First, Zhu points to defense counsel's cross examination of Officer Butler, *i.e.*, "Andrew," during which counsel attempted to introduce 150-200 pages of emails between Dr. Hui and Andrew. The district court raised its own objection to the volume of the documents and "chastis[ed Zhu's] counsel for not providing them to the agent sooner." Brief of Appellant at 40. In response, the government suggests that the court was merely trying "to prevent a large number of extraneous emails from being admitted into evidence and made available to the jury." Brief of Appellee at 46. The district court

then permitted defense counsel to admit and use specific, individual emails during cross examination. We agree that the district court acted within its discretion by proceeding in this fashion rather than accepting into evidence 150-200 pages of emails at the same time. And, more importantly, this relatively brief intrusion by the district court can in no sense be viewed as having "creat[ed] an appearance of partiality." *Castner*, 50 F.3d at 1272 (internal quotation marks omitted).

Zhu next highlights numerous comments made by the district court while defense counsel questioned a witness regarding whether she "[knew] anything about Mr. Zhu working in Virginia Beach." J.A. 555. The court would not permit the witness to answer the question on the basis that the question called for hearsay. Instead, the court instructed counsel to rephrase the question "in a way that focuses only on her personal knowledge, what she observed, what she knows, without telling us what other people told her." J.A. 557. When defense counsel made several attempts to rephrase the question, the district court interrupted numerous times to remind counsel to establish the "source or basis" of the witness's knowledge. J.A. 560.

Zhu's primary complaint seems to be that the district court interposed hearsay objections while the government remained silent. Zhu does not suggest, however, that the court's concern about hearsay was mistaken. And, even if the district court's conclusion that the witness was being asked to give hearsay testimony was in error, the court did not create an improper appearance of partiality in light of the entire record, which includes instances where the court interrupted the government's attorneys in a similar fashion.

21

Finally, Zhu contends that it was improper and prejudicial for the district court to interrupt defense counsel's reference to "reasonable doubt" during closing argument. To the extent the district court merely explained that there would be no instruction to the jury on reasonable doubt, the court's statement was certainly consistent with our law. *See United States v. Headspeth*, 852 F.2d 753, 755 (4th Cir. 1988) ("We have frequently admonished district courts not to attempt to define reasonable doubt in their instructions to the jury absent a specific request from the jury itself . . . on the theory that the term reasonable doubt has a self-evident meaning comprehensible to the lay juror, which judicial efforts to define generally do more to obscure than to illuminate." (internal quotation marks omitted)), *abrogated on other grounds*, *Taylor v. United States*, 495 U.S. 575 (1990).

With regard to the court's instruction that the jury disregard part of counsel's argument, it is unclear what the jury was supposed to disregard, particularly in light of the fact that counsel was permitted to finish her argument that reasonable doubt is a very demanding standard of proof. We do not find that the district court created the appearance of partiality with its comments during closing argument.

In sum, we conclude that the district court discharged its duty to conduct the trial "in a general atmosphere of impartiality," *Castner*, 50 F.3d at 1272, and the court's comments and interruptions during Zhu's presentation of evidence, either by themselves or taken together as a whole, did not undermine the impartial quality of the proceedings. Accordingly, we reject this challenge to Zhu's conviction.

## V.

For the foregoing reasons, we affirm the judgment of the district court.

<u>AFFIRMED</u>
