**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-4095

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JOSEPH HOWARD DAVIS,

Defendant - Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Statesville.  Richard L. Voorhees, Senior District Judge.  (5:16-cr-00065-RLV-DCK-1)

Argued:  January 31, 2019                          Decided:  March 19, 2019

Before WILKINSON, NIEMEYER, and KING, Circuit Judges.

Affirmed by published opinion.  Judge Niemeyer wrote the opinion, in which Judge Wilkinson and Judge King joined.

**ARGUED:**  Eric Jason Foster, LAW OFFICE OF RICK FOSTER, Asheville, North Carolina, for Appellant.  Amy Elizabeth Ray, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee.  **ON BRIEF:**  R. Andrew Murray, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

NIEMEYER, Circuit Judge:

Challenging his conviction for distribution of over 50 grams of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A), Joseph Davis contends that the district court erred (1) in admitting an out-of-court statement that a confidential informant made about having purchased drugs from Davis prior to the relevant investigation; (2) in failing to require adequate authentication of an officer's photographs of the informant's cellphone screen as she purportedly texted Davis in preparation for a controlled buy; and (3) in admitting a recording of a telephone conversation between the informant and Davis, authenticated by an officer's identification of Davis's voice. Davis also contends that the district court erred in failing to explain its use of coconspirator testimony to find drug quantities for sentencing purposes after the jury had acquitted Davis on a charged conspiracy count.

For the reasons that follow, we conclude that the district court did not abuse its discretion in its admission of the challenged evidence. We also conclude that Davis's sentence was not procedurally unreasonable. The district court adequately explained its decision to credit the testimony of Davis's coconspirators about drug quantities despite the acquittal on the conspiracy count. Accordingly, we affirm.

I

Davis was indicted in four counts with methamphetamine trafficking and related violations in Charlotte, North Carolina, during the period from 2014 to 2016. Count I alleged that Davis participated in a conspiracy to distribute 50 grams or more of

2

methamphetamine and 500 grams or more of a substance containing methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. Count II charged Davis with possession of a firearm in furtherance of the conspiracy, in violation of 18 U.S.C. § 924(c). Count III alleged that Davis distributed 50 grams or more of methamphetamine on or about October 12, 2016, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). And Count IV charged Davis with possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1).

At trial, the government offered evidence of an alleged conspiracy in which Reggie Shaw supplied Davis with substantial amounts of methamphetamine to sell to Roderick Roberts and Tangie Carroll. It also offered evidence of a controlled buy on or about October 12, 2016, in which Davis sold a confidential informant (hereafter "the Informant"), 54 grams of pure methamphetamine. That transaction took place at a mailbox cluster for the apartment complex where Davis lived and was witnessed by an undercover officer. Finally, the government offered evidence of Davis's illegal possession of firearms.

The jury found Davis not guilty on Counts I and II, which charged Davis with conspiracy to traffic in methamphetamine and possession of a firearm in furtherance of that conspiracy, but found him guilty of distributing 50 grams or more of methamphetamine on or about October 12, 2016, and possession of a firearm by a felon.

The district court imposed a downward-variance sentence of 260 months' imprisonment, after calculating an advisory Guidelines range of 360 months' to life imprisonment. In determining the offense level, the court affirmed the presentence

3

report's determination that Davis was responsible for 4.5 kilograms or more of methamphetamine based on the testimony given at trial by Davis's alleged coconspirators, Shaw and Carroll. Based on the jury's acquittal on the conspiracy count, Davis objected to the district court's use of the coconspirators' testimony to determine drug quantities. The district court overruled the objection, finding that the alleged coconspirators testified "convincingly" as to drug amounts.

Davis filed this appeal challenging his conviction, based on the allegedly erroneous evidentiary determinations, and his sentence, based on the court's purported failure to explain why it relied on acquitted conduct.

II

Challenging his conviction, Davis contends that the district court erred in admitting three items of evidence during trial: (1) the testimony of Officer Jeff Jenkins explaining that he enlisted the Informant to participate in a controlled buy because she told him that she had purchased methamphetamine from Davis; (2) photographs that Officer Jenkins took of the Informant's cellphone screen as she was purportedly texting with Davis; and (3) a recording of a telephone call between the Informant and a man whom Officer Jenkins identified as Davis. We address each of these points in order, reviewing them for abuse of discretion. *See United States v. Burfoot*, 899 F.3d 326, 340 (4th Cir. 2018).

4

A

Davis first contends that the district court erred in admitting an out-of-court statement of the Informant through the testimony of Officer Jenkins, who was explaining why he enlisted the Informant to make a controlled buy from Davis. Jenkins testified that the Informant had told him that she had previously purchased methamphetamine from Davis, as follows:

> Q. Can you tell us what you did with regard to investigating Mr. Davis?
>
> A. We had been involved in a methamphetamine conspiracy in the Western District of North Carolina, and Mr. Davis's name came up in that investigation prior to me meeting him.
>
> Q. What proactive steps did you take in the investigation?
>
> A. *I had an informant that had came forward to me and stated that they were currently purchasing methamphetamine from Joseph Davis* and could facilitate a purchase during a controlled buy while cooperating with us in that investigation.

(Emphasis added). Davis did not object to the evidence at trial. He now argues, however, that we should conclude that Jenkins's statement about what the Informant had stated to him was inadmissible hearsay under Federal Rule of Evidence 802 and that it, together with the other inadmissible evidence challenged on appeal, "requires this court to reverse his conviction and remand for a new trial."

Yet, even as Davis challenges Jenkins's testimony about what the Informant had told him, Davis did not at trial, nor does he now on appeal, challenge Officer Joseph Barringer's testimony to the same effect. Barringer testified:

> Q. All right. Now, at some point, were you involved in a controlled purchase of methamphetamine from the defendant in this case?

5

A. Yes, I was.

Q. Can you tell us about that?

A. There were two different incidents where we set up controlled purchases from the defendant in this matter. Both were using a young lady from Hickory, North Carolina, [the Informant] who was the girlfriend of Billy Greene. *She had met with local law enforcement officials and explained that she had been involved in the distribution of methamphetamine and heroin in the Catawba County area and identified the defendant as one of her sources of supply in this case*.

(Emphasis added). Davis's challenge to Jenkins's testimony, if successful, would thus hardly accomplish anything meaningful.

In any event, with respect to Davis's challenge to Officer Jenkins's testimony about the Informant's out-of-court statement, Davis must now, on appeal, not only demonstrate to us that the district court abused its discretion in failing to exclude the evidence *sua sponte*, and therefore plainly erred, but also that the error affected his substantial rights and seriously affected the fairness of his trial. *See United States v. Moore*, 810 F.3d 932, 939 (4th Cir. 2016). We conclude that he fails at the first step.

What is apparent from Officer Jenkins's testimony, as well as Officer Barringer's, is that both were explaining *why* they solicited the Informant as an informant. Because the Informant had told them that she had been purchasing methamphetamine from Davis, the officers concluded that she, as an informant, would work credibly in participating in a controlled buy from Davis. Thus, the testimony was offered not for the truth of whether the Informant had in fact purchased methamphetamine from Davis on prior occasions, but rather as an explanation — or a motive — for the officers' using the Informant in setting up the controlled buy. In these circumstances, the testimony was not even hearsay

6

barred by Federal Rule of Evidence 802, as Davis claims. Federal Rule of Evidence 801(c) defines hearsay as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." *See also United States v. Love*, 767 F.2d 1052, 1063 (4th Cir. 1985) (holding that a statement made by a declarant out of court was not hearsay because it "was offered not for its truth but only to explain why the officers and agents made the preparations that they did in anticipation of the appellants' arrest"). Since the Informant's out-of-court statement was not offered for its truth, we reject Davis's challenge to this evidence.

B

Davis contends next that the district court abused its discretion in admitting photographs taken by Officer Jenkins of text messages on the Informant's cellphone. Jenkins testified that he was with the Informant on the day of the controlled buy and that during her texting leading up to the transaction, he sat next to her and watched her send and receive text messages. With her permission, he took photographs of her cellphone screen, revealing the various texts exchanged between the Informant and contacts labeled in the cellphone as "Joseph Davis" and "Joseph Other." Davis objected to the admission of the photographs, contending that it violated Federal Rule of Evidence 901, which provides, "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Davis argues that the government did not properly

7

authenticate the photographs in that it did not provide any evidence to support a conclusion that it was in fact he who was sending the text messages to the Informant, such as by introducing evidence that his phone numbers matched the phone numbers for "Joseph Davis" and "Joseph Other." While the photographs themselves were authenticated by Jenkins as accurate portrayals of the texts he was photographing, he concededly could not link the texts to the defendant Davis by a phone number, even though the photographs did accurately reveal that the texts were coming from contacts labeled "Joseph Davis" and "Joseph Other."

The government contends that the district court did not unreasonably conclude that a reasonable jury could find that Jenkins understood enough about the subject matter of the text messages and their context "to authenticate them" and that therefore the court correctly concluded that the absence of phone numbers or other information directly identifying the sender of the texts to the Informant's cellphone simply went to the weight of the evidence, not its admissibility.

We recognize that the district court's role, as the presider over the trial, "is to serve as gatekeeper in assessing whether the proponent has offered a satisfactory foundation from which the jury could reasonably find that the evidence is authentic." *United States v. Vidacak*, 553 F.3d 344, 349 (4th Cir. 2009). But "the burden to authenticate under Rule 901 is not high"; the "court must merely be able to conclude that the jury *could* reasonably find that the evidence is authentic, not that the jury necessarily *would* so find." *United States v. Recio*, 884 F.3d 230, 236–37 (4th Cir. 2018) (internal quotation marks and citation omitted). Thus, we require only a prima facie showing that

8

the "true author" is who the proponent claims it to be. *Id.* at 237; *see also United States v. Zhu*, 854 F.3d 247, 257 (4th Cir. 2017); *United States v. Cornell*, 780 F.3d 616, 629 (4th Cir. 2015); *United States v. Hassan*, 742 F.3d 104, 133 (4th Cir. 2014). And the prima facie showing "may be accomplished largely by offering circumstantial evidence that the documents in question are what they purport to be." *Vidacak*, 553 F.3d at 350.

We conclude that in this case, the record contains ample contextual evidence to create a prima facie showing that the Informant was, in fact, texting with the defendant Davis when her cellphone showed the texts to be from "Joseph Davis" or "Joseph Other." First, the clear purpose manifested by the substance of the texts was to arrange the place of the controlled buy and to arrive at an agreed-upon price for the drugs. For example, the Informant texted, "Where am I going to[]" and "I'm riding in circles where do I go," to which "Joseph Other" responded, "The mail box." The Informant then drove to "the mail box" — the mailbox cluster for Davis's apartment complex — and waited for ten minutes, after which Davis arrived and engaged in the controlled buy, as observed by witnesses. This context alone was sufficient to support the conclusion that the Informant was actually texting with Davis.

But also, in a similar vein, many of the texts exchanged during the hour before the transaction took place addressed the price for the purchase of the two ounces of methamphetamine that the Informant had agreed to buy. The street price, as Officer Jenkins testified, was $900 per ounce, and "Joseph Other" and the Informant were debating whether the transaction for two ounces should be for a price lower than the $1,800 street price for two ounces — anywhere from $1,600 to $1,750. About 10 to 15

9

minutes before the transaction took place, the Informant texted, "So what's the price," to which "Joseph Other" texted, "1750." A few minutes later, after the Informant complained about the price as high, "Joseph Other" texted, "I know what I told u I'm not gonna say 16 when I pay more than that." A few minutes later, the Informant texted, "I mean I thought the most you would do was 1700 like you said." She then continued "I'm at mailbox," and "Joseph Other" texted back, "I didn't say that," to which the Informant texted, "I'm at the mailbox." "Joseph Other" continued, "It's good shit don't let the little stuff fool u." The transaction that then actually occurred a few minutes later involved Davis's sale of 54.15 grams (two ounces) of methamphetamine, and it was indeed "good shit," as "Joseph Other" texted — 96% pure, as determined by laboratory tests. Thus, the texting with "Joseph Other" was again linked to the real-world conduct of the transaction with the defendant Davis, about which there was direct witness testimony.

In addition, during the course of texting to set up the controlled buy, the Informant and Davis engaged in a telephone conversation, which Officer Jenkins confirmed, as he was able to identify Davis's voice. While Davis testified at trial and denied that it was his voice in the call, he acknowledged that the telephone call was made to "the same number that [the Informant] was texting on . . . October 11."

Moreover, while Davis also denied sending the Informant the texts shown on the photographs, there was no explanation at trial that the contact label on those texts — "Joseph Davis" and "Joseph Other" — could have referred to any person other than the defendant Davis, with whom the Informant had regularly been texting. Davis seemed to acknowledge as much at trial:

10

Q. Did you meet with [the Informant] on October 11, 2016?

A. I don't know. *We had been going back and forth* about the money that she was supposed to be paying me back, or whatever, her and her boyfriend, or whatever, and so I don't remember the dates or whatever. She's come up there a couple times though. Most of the time it was to borrow money.

Q. So you're saying the texts on October 11th were about money that she owed you?

A. *Some of them, yes, sir.* Actually, the text was from — they was three people, actually, in the text.

(Emphasis added).

Finally, as broader contextual evidence, Officer Jenkins testified not only that he was with the Informant during the 12 hours before the controlled buy, as the Informant was sending and receiving text messages to set up the transaction, but also that he had knowledge of the entire investigation into Davis and the incidents referred to in the texts involving Davis, supporting Jenkins's conclusion that the texts on the Informant's cellphone were from Davis.

We conclude that the government amply made the prima facie showing required by Rule 901 and that the district court did not abuse its discretion in admitting the photographs that Jenkins took of the Informant's cellphone screen. Any doubt remaining about whether the "Joseph Davis" or "Joseph Other" was actually the defendant Davis was appropriately left for the jury to resolve. *See Zhu*, 854 F.3d at 257.

## C

Finally, Davis contends that the district court abused its discretion in admitting the recording of a telephone conversation between the Informant and purportedly Davis, which Officer Jenkins testified was in fact a conversation between the Informant and Davis based on his recognition of their voices. The telephone call addressed the upcoming controlled buy and took place among the various texts exchanged that day between the Informant and "Joseph Other," setting up the controlled buy. Jenkins testified that he was familiar with Davis's voice from other "phone calls" and from "a couple of hours of speaking back and forth while in his residence and during an interview process" of Davis. Davis argues that this was insufficient to authenticate the recording. We disagree.

Federal Rule of Evidence 901(b)(5) states that "[a]n opinion identifying a person's voice — whether heard first hand or through mechanical or electronic transmission or recording — based on hearing the voice at any time under circumstances that connect it with the alleged speaker" satisfies the requirement of authenticating evidence. Thus, we conclude that Jenkins's testimony that his in-person conversations with Davis enabled him to recognize the voice on the telephone as Davis's was sufficient authentication. Again, any further doubt could be resolved by the jury.

## III

In sentencing Davis, the district court calculated Davis's advisory Guidelines range by relying in part on its finding that Davis was responsible for 4.5 kilograms or

12

more of methamphetamine. Based on that finding, the court calculated a total offense level of 42, which, when combined with Davis's criminal history category of V, resulted in an advisory Guidelines sentencing range of 360 months' to life imprisonment. The court imposed a downward-variance sentence of 260 months' imprisonment for the drug-trafficking offense and 120 months for the felon-in-possession offense, to be served concurrently.

Davis objected to the court's drug-quantity finding on the ground that it was based on the trial testimony of coconspirators Shaw and Carroll, and the jury had found Davis not guilty on the conspiracy count that involved Shaw and Carroll. The court overruled the objection, explaining:

> Looking at the objections, the Court takes note that defendant has objected to certain aspects of the facts that would come under the heading of Offense Conduct. Those objections . . . appear to conflict with trial testimony, which is what the probation officer has related under Offense Conduct. [D]efendant's contentions are otherwise noted for information purposes, albeit the Court doesn't believe they're supported by the evidence at trial, this Court having heard the evidence. So these objections are overruled.

And the court later explained that it found that Shaw and Carroll testified "convincingly" as to drug amounts.

Davis now argues that his sentence was procedurally unreasonable because, in overruling his objection, the district court did not specifically mention that the jury found him not guilty of participating in the drug-trafficking conspiracy, and the court needed to explain why it purportedly "disagreed" with the jury and found credible the testimony that the jury allegedly did not.

13

In response, the government notes that the district court was entitled to consider acquitted conduct in establishing drug quantities and that once a court explained that it had found the testimony of Davis's alleged coconspirators "convincing," the court was "under no obligation to further explain why it found that testimony convincing and supported its choice of sentence with an adequate explanation."

Of course, it is well established that a sentencing judge "must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." *Gall v. United States*, 552 U.S. 38, 50 (2007). Moreover, the Supreme Court has explained that "[t]he appropriateness of brevity or length, conciseness or detail, when to write, what to say, depends upon circumstances. Sometimes a judicial opinion responds to every argument; sometimes it does not; sometimes a judge simply writes the word 'granted' or 'denied' on the face of a motion while relying upon context in the parties' prior arguments to make the reasons clear." *Rita v. United States*, 551 U.S. 338, 356 (2007). At bottom, the obligation of the sentencing judge is to "set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority." *Id*; *see also Chavez-Meza v. United States*, 138 S. Ct. 1959, 1963–66 (2018).

At Davis's sentencing, the district court spoke at length — covering four pages of transcript — explaining the sentence he was imposing on Davis, and this explanation included responses to the arguments that Davis had made. In addition, the court spent an additional two pages explaining its rulings on Davis's objections to various sentencing

14

factors recommended in the presentence report. Davis argues now, however, that the court needed to explain more about why it accepted the presentence report's finding that he was responsible for at least 4.5 kilograms of methamphetamine. We disagree, as we conclude that the court's explanations were sufficient.

The court explained its understanding of Davis's argument and why it rejected it, finding that Davis's position was not supported by the evidence at trial. It said that it heard the evidence presented at trial of drug quantities attributable to Davis and found it convincing. This explanation thus addresses Davis's argument that the court should not have credited the testimony because the jury allegedly did not. Indeed, it provided this court with sufficient reasons for the drug-quantity finding that the finding could be reviewed.

Animating Davis's position seems to be the view that a court may not consider acquitted conduct in establishing drug amounts. That, however, is not the law. "It has long been established that sentencing courts may consider acquitted conduct in establishing drug amounts for the purpose of sentencing." *United States v. Perry*, 560 F.3d 246, 258 (4th Cir. 2009). Of course, the court must find the drug amounts established by a preponderance of the evidence. Thus, even if a court knows that a jury had a *reasonable doubt* about drug quantities, that doubt would not preclude the court's finding of those quantities by a *preponderance of the evidence*, a lower standard.

More importantly, Davis's argument presumes that in acquitting Davis on the conspiracy count, the jury made a factual finding *about drug quantities* testified to by the coconspirators. But that is too much to presume because the jury's not-guilty verdict on

15

the conspiracy count could have been based on numerous reasons relating to doubt about Davis's involvement or the absence of proof of an element of the crime. A finding of the drug quantity involved was therefore not necessary to a verdict of acquittal on the conspiracy count.

As the district court acted within its lawful discretion by relying on testimony relating to an acquitted count, its explanation that it found coconspirator testimony convincing and Davis's argument to the contrary to be unsupported was an adequate explanation.

*     *     *

The judgment of the district court is accordingly

AFFIRMED.